Larry James CARTER, Appellant,

v.

Christine Karen BRODRICK, Appellee.

No. 5511.

Supreme Court of Alaska.

May 14, 1982.

---

William T. Ford, Anchorage, for appellant.

Robert A. Rehbock, Rehbock & Rehbock, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

CONNOR, Justice.

This is an appeal from an order refusing, as a matter of law, to grant visitation rights to an ex-stepfather. At issue is the construction of AS 09.55.205, the jurisdictional predicate for custody and visitation orders.

### A. Facts

Christine Brodrick and Larry Carter were married on August 5, 1976. At that time Christine's son by a prior marriage, David W. Brodrick, was nearly four years old. Larry and Christine subsequently had a child of their own, Carrie L. Carter, who was born March 21, 1977. On June 18, 1979, Christine filed for divorce. The divorce decree, rendered March 17, 1980, incorporated the terms of a "parental agreement" negotiated by the parties prior to the decree. This parental agreement provided for custody and visitation as follows:

"WHEREAS The Mother has a child from a former marriage, David Brodrick ... hereinafter referred to as 'Son', and the parties have a child born of this marriage, Carrie Carter ... hereinafter referred to as 'Daughter'; and

WHEREAS the Son has not been adopted by Father, and Father and Mother do not presently contemplate such adoption and are not in agreement thereto; but the parties agree that it is in the best interest of both children that they be treated as a family; and

WHEREAS Father has in fact been the only psychological father Son has known and has been treated as such; and

WHEREAS Mother and Father agree that Son and Daughter should be given free and open access to both parents;

NOW THEREFORE, in consideration of the mutual promises between the parties contained herein, it is hereby agreed as follows:

1) Mother and Father shall share equally parental responsibility for the care and upbringing of Son and Daughter.

2) The parties shall consult each other concerning all major decisions affecting Son and Daughter, including, but not limited to substantial decisions involving education, health and discipline matters. Father shall have access to all legal and other records pertaining to Son and Daughter including but not limited to, school, medical, and religious records.

3) The parties will maintain and encourage open lines of communication between each other and the children and in furtherance thereof shall not at any time disparage the other parent in the presence of the children and shall actively encourage strong parent-child relationships.

. . . . .

7) Mother and Father's parents will be encouraged to visit with the children and both parties agree to accommodate these visits during the periods the children are residing with them, provided, they are

given ample notice and the visit [sic] are reasonable in duration.

.    .    .    .    .

9) Both parties shall have reasonable telephone access with the children. Each parent, when the children are in his or her care, shall encourage such contact.

10) In the event either party shall be away from the Anchorage area on business or recreation, without the children, he or she will place the children with the other party during this period unless the other party is unable to assume responsibility."

The agreement additionally provided that both children would reside with Christine during the school year but with Larry during the summer, each parent to have two days custody every two weeks during the other's period of custody.

After their divorce the parties' relations worsened, and Larry was able to exercise visitation with David, his ex-stepson, only a few times. In June of 1980, Christine sent David to her parents' home in Minnesota for the summer, rather than to Larry as the agreement provided.

After an effort to resolve their disagreements failed, Larry filed a motion in the superior court to compel compliance with the terms of the parental agreement. At the end of a hearing on the motion, the trial court struck David's name from the visitation agreement, thus rescinding Larry's visitation with his ex-stepson, stating:

"I think that you're using the children to get at one another.

I believe that I may have made a mistake by encouraging or permitting David's name to be included in the parental agreement because that was bound to create problems with people like you. You're just plainly not mature enough to understand the needs of children and to provide a nurturing environment for children. Nevertheless, you're both fit parents and should be allowed to parent your natural youngsters.

So the order is that the child, David, is stricken from the parental agreement. Mr. Carter never adopted David and even though he did a lot of parenting for David while the parties were married and after they ceased living together, he has *no legal claim* to David. And that's the law." (emphasis added).

The trial court subsequently stayed its order and provided that visitation was to occur with both children. Faced with Christine's continuing refusal to obey, however, and the prospect of issuing a contempt order, the court subsequently rescinded the stay order.

According to counsel, Larry has not had any contact with David since April, 1980; summer visitation was with Carrie alone, and Larry continues to exercise visitation with her, his natural daughter, under the terms of the original parental agreement.

### B. Stepparent Visitation

Stepparent visitation is an issue of first impression in Alaska. The statute in issue reads:

"In an action for divorce or for legal separation the court may, ... during the pendency of the action, or at the final hearing or at any time thereafter during the minority of any *child of the marriage*, make an order for the custody of or visitation with the minor child which may seem necessary or proper and may at any time modify or vacate the order." (emphasis added).

AS 09.55.205. At issue is whether this statute establishes or precludes superior court jurisdiction over stepchildren, *i.e.*, is a stepchild a "child of the marriage?" If so, the superior court erred in denying Larry visitation merely because of the lack of a blood or adoptive relationship between them.

Larry urges this court to recognize the common law doctrine of in loco parentis.[1] Larry argues that if a stepparent has as-

1. Larry relies on AS 01.10.010, which adopts the common law in Alaska:

"So much of the common law not inconsistent with the Constitution of the State of Alaska or the Constitution of the United States or with any law passed by the legislature of the State of Alaska is the rule of decision in this state."

sumed the status and obligations of a parent to a child, then that child is "of the marriage" within the meaning of AS 09.55.-205 and, therefore, the superior court has jurisdiction to grant stepparent visitation. Assuming jurisdiction exists, Larry then argues that as one standing in loco parentis, he has "exactly the same right to custody and visitation as a natural or adopted parent." Emphasizing his close relationship with David, the need to determine visitation in light of the child's best interests, and the undesirability of differential treatment regarding visitation of Carrie and David, Larry argues that the superior court abused its discretion in denying him visitation.

Christine, on the other hand, argues that the language "child of the marriage" in AS 09.55.205 encompasses only natural or adopted children. She argues that stepparent visitation in a society of transitory relationships would result in confusion for children and generally would not be in their best interests. Additionally, she argues that adopting the common law concept of in loco parentis conflicts with AS 09.55.205. Finally, she argues that even if Larry has a visitation interest, the trial court did not abuse its discretion in denying him visitation with David.

Of the six jurisdictions that have ruled on stepparent visitation, five have recognized it notwithstanding the absence of clear statutory authorization. *See Collins v. Gilbreath*, 403 N.E.2d 921, 922–24 (Ind.App. 1980); *Simpson v. Simpson*, 586 S.W.2d 33, 35–36 (Ky.1979); *Looper v. McManus*, 581 P.2d 487, 488–89 (Okl.App.1978); *Spells v. Spells*, 250 Pa.Super. 168, 378 A.2d 879, 881–83 (1977); *Gribble v. Gribble*, 583 P.2d 64, 66–67 (Utah 1978). These courts authorizing stepparent visitation have done so on the premise that the stepparent has become a surrogate parent. This concept, expressed in the journals as that of "psychological parentage,"[2] finds its legal basis either explicitly or implicitly in the common law doctrine of in loco parentis.

> "The term 'in loco parentis' means in the place of a parent, and a 'person in loco parentis' is one who has assumed the status and obligations of a parent without formal adoption. Whether or not one assumes this status depends on whether that person *intends* to assume that obligation.
>
> 'Where one stands in loco parentis to another, the rights and liabilities arising out of that relation are, as the words imply, exactly the same as between parent and child.'" (footnotes omitted).

*Gribble v. Gribble*, 583 P.2d 64, 66 (Utah 1978). In that case, the stepfather had lived with the child from the latter's age of two months to four years old, had treated him as his own son, and had expressed concern about his future. After the divorce, the natural mother objected to visitation by the ex-stepfather. The relevant statute recognized visitation rights only in "parents, grandparents and other relatives...." *Id.* at 66. While the court noted that the stepparent relationship *alone* would confer no rights or obligations, the assumption of in loco parentis status would put him in a different position, conferring upon him the same rights as a natural par-

2. A psychological parent has been described as:
"one who, on a day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological need for an adult. This adult becomes an essential focus of the child's life, for he is not only the source of the fulfillment of the child's physical needs, but also the source of his emotional and psychological needs.... The wanted child is one who is loved, valued, appreciated, and viewed as an essential person by the adult who cares for him.
  It is this relationship, the psychological parent-wanted child relationship, which over and above all others is worthy of protection by the legal system. This relationship may exist between a child and any adult; it depends not upon the category into which the adult falls—biological, adoptive, foster, or common-law—but upon the quality and mutuality of the interaction." (footnote omitted).

Gruenberg & Mackey, A New Direction for Child Custody in Alaska, 6 U.C.L.A.-Alaska L.Rev. 34, 36 (1976). *See also* Muench & Levy, Psychological Parentage: A Natural Right, 13 Fam.L.Q. 129 (1979); Note, Psychological Parents vs. Biological Parents: The Courts' Response to New Directions in Child Custody Dispute Resolution, 17 J.Fam.L. 545 (1978–79).

ent and thus bringing a stepparent within the statute.

Additionally, the court ruled that divorce does not terminate the in loco parentis status:

"[O]nly the surrogate parent or the child is able to terminate the status at will, and the rights, duties, and obligations continue as long as they choose to continue the relationship." (footnotes omitted).

*Id.* at 67. The court then remanded the case for a hearing on whether the stepfather stood in loco parentis, and noted further that the trial court should examine the obligations of that status as well:

"It may be that if a stepfather standing in the status of in loco parentis is given the opportunity to seek visitation rights as a right afforded a natural parent, that he should not be permitted to escape the duties and obligations of the . . . status as long as that relationship remains intact. A hearing could determine not only the right to visitation, but could determine whether that right should be conditioned on a requirement that the stepfather accept an obligation to assist in the support of the child."

*Id.* at 68.

Two of the other five cases also explicitly adopted the in loco parentis approach. In *Simpson*, the stepmother reared the child from age seventeen months to age eight (*i.e.*, for six years). The court ruled that visitation with a surrogate parent may be in the child's best interest, and remanded for a fuller evidentiary hearing. In *Spells*, the stepfather had lived with the children for over three years. Emphasizing that the focus is on the child's best interest, the court noted the strong bond that can exist in a steprelationship:

"It is our belief that a stepfather may not be denied the right to visit his stepchildren merely because of his lack of a blood relationship to them. Clearly, a stepfather and his young stepchildren who live in a family environment may develop deep and lasting mutual bonds of affection. Courts must acknowledge the fact that a stepfather (or stepmother) may be

the only parent that the child has truly known and loved during his minority. A stepparent may be as devoted and concerned about the welfare of a stepchild as a natural parent would be. Rejection of visitation privileges cannot be grounded in the mere status as a stepparent." 376 A.2d at 881.

The only located case rejecting stepparent visitation is the California decision of *Perry v. Superior Court*, 108 Cal.App.3d 480, 166 Cal.Rptr. 583 (1980), where the court was confronted with language virtually identical to that of AS 09.55.205. There the court held that a stepchild was not "of the marriage" and therefore the child, whom the stepfather reared from the age of nine months to the age of six years, was not before the court. The concurrence took the view that had the stepfather alleged that he stood in loco parentis, then the superior court might have jurisdiction over the subject matter:

"If Husband had asserted in his Response to the Petition in the dissolution action that there were children of the marriage because he stood *in loco parentis* with regard to Lonnie, the superior court might have jurisdiction over the subject matter. In other words, if Husband had raised the issue and had been found by the superior court to be *in loco parentis* with regard to Lonnie, one would conclude that Lonnie was a 'child of the marriage' within Civil Code section 4351. . . ." (emphasis in original).

108 Cal.App.3d 480, 166 Cal.Rptr. at 586. The California Supreme Court subsequently denied review, two justices dissenting.

There is some indication that the Alaska legislature intended to allow third-party visitation, which would encompass stepparents. First, AS 09.55.205 authorizes visitation orders which "may seem necessary or proper." No potential visitors are excluded. Second, the language in AS 09.55.238, pertaining to enforcement actions for failure to permit visitation, encompasses more than just natural parents:

"(a) When a court order is specific as to when a custodian of a minor child must permit *another person* to have visitation

with that child, and the custodian fails, wilfully and without just excuse, to permit visitation with the child in substantial conformance with the court order, the person entitled to visitation has a separate cause of action against the custodian for damages." (emphasis added).

Inferentially, a phrase more restrictive than "another person" would have been utilized if third-party visitation was not to be available.[3]

Third, the Uniform Child Custody Jurisdiction Act, AS 25.30.010–.910, recognizes that the court has jurisdiction in custody disputes which may involve parties other than biological parents. For example, AS 25.30.020, the section under which jurisdiction is determined, also refers to persons claiming custody and persons acting as parents. It is also clear that the court would have jurisdiction to award *custody* of a stepchild to the stepparent if the court found that custody with the natural parent would be clearly detrimental to the child. *Britt v. Britt*, 567 P.2d 308 (Alaska 1977). It would be inconsistent to rule that the court has jurisdiction to grant custody to the stepparent, but lacks jurisdiction to grant visitation.

Because these child custody provisions are in pari materia with AS 09.55.205, they should be construed together and in a harmonious manner. *See* 2A C. Sands, Sutherland Statutory Construction, §§ 51.02–.03 at 290–313 (4th ed. 1973). What can be distilled from the above provisions is that the legislature anticipated and granted the court jurisdiction to determine the custody and visitation of a child in a variety of situations where biological parentage is not a determinative factor of jurisdiction. The statutes recognize that those relationships that affect the child which are based upon psychological rather than biological parentage may be important enough to protect through custody and visitation, to ensure that the child's best interests are being served.

We therefore also construe the jurisdictional statute to recognize those relationships, and hold that where a stepparent has assumed the status of in loco parentis, a stepchild is a "child of the marriage" within AS 09.55.205.[4]

Therefore, the case is reversed and remanded to the trial court for a determination of whether or not the stepfather actually stands in loco parentis to the child, and, if so, whether it is in the child's best interest to grant him a right of visitation.[5]

REVERSED AND REMANDED.

---

**3.** The only Alaska case raising third-party visitation is *Rasco v. Moran*, 475 P.2d 696 (Alaska 1970). In that case the natural parents had died in a plane crash and both the paternal and maternal grandparents petitioned for appointment as guardians. The trial court granted the maternal grandparents' petition. On appeal the paternal grandparents argued, in part, that the superior court erred in not granting them visitation. In *dicta* this court indicated such third-party visitation might be available:

"Since the court below did not rule on this matter, there is nothing to appeal, and the Rascos may petition the superior court for visitation rights without showing change of circumstances." (footnote omitted).

*Id.* at 698.

**4.** We observe that under the recently amended version of AS 09.55.205, which will take effect June 24, 1982, the legislature has chosen to explicitly recognize these relationships:

"[T]he court may, . . . during the minority of a child of the marriage, make, modify, or vacate an order for the custody of or visitation with the minor child that may seem necessary or proper, *including an order that provides for visitation by a grandparent or other person if that is in the best interests of the child.*" (emphasis added).

Ch. 15, § 1 SLA 1982.

**5.** In so holding, we do not intend to open the door to a myriad of unrelated third persons who happen to feel affection for a child. Nor do we intend to diminish the rights of the natural parent concerning his or her minor children. Our decision is explicitly limited to the type of factual situation before us, where the party seeking visitation is claiming he has acted in a parental capacity. The factual dispute as to the question of the intent of a person to assume the status of parent is only preliminary; the determinative question remains as to what is in the best interests of the child.