Bernard R. KINNARD, Appellant,

v.

Debra F. KINNARD, Appellee.

No. S–10207.

Supreme Court of Alaska.

March 15, 2002.

Gayle L. Garrigues, Law Office of Rita T. Allee, P.C., Fairbanks, for Appellant.

Andrew Harrington, Alaska Legal Services Corporation, Fairbanks, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

This case arises out of the divorce of Bernard and Debra Kinnard. The superior court awarded shared custody of Kristine Kinnard to Bernard, her father, and Debra, her stepmother. Because the trial court did not err in finding that Debra is the psychological parent of Kristine, and that removal of Debra from Kristine's life would be detrimental to the child, we affirm the award of shared custody. We also affirm the trial

court's order directing Bernard to either reinstate Debra to his health insurance policy or pay for her surgery out of his share of his pension.

## II. FACTS AND PROCEEDINGS

### A. Factual History

Bernard and Debra Kinnard were married on October 25, 1993. There were no children born of the marriage. However, during the marriage, Bernard's two children from previous relationships—Brandon, born September 19, 1982, and Kristine, born November 11, 1988—resided with Bernard and Debra. Bernard is a nutritional cook at a hospital and Debra is a licensed foster parent who cares for disabled children. Bernard and Debra separated in November 1999.

Bernard now lives with another woman, Rachel, who has an eleven-year-old daughter named Andrea. Rachel has made physical threats toward Debra, on one occasion in the presence of Kristine. Kristine also reports that Rachel's daughter, Andrea, often hits her. In June 2000 Bernard and Rachel required Kristine to write a letter to the custody investigator claiming that she did not want to live with Debra and that "her new mother" was Rachel. Bernard and Rachel told Kristine to write a second letter in which she stated that she did not want to see Debra anymore. Kristine later told the custody investigator that Bernard and Rachel forced her to write the letters and instructed her on what to say and that the statements in the letters were not true. In the custody investigator's view, Bernard and Rachel were trying to "thwart the relationship between Kristine and Debra."

Debra suffers from a severe degenerative joint disorder in her knees which is exacerbated by her weight. The joint disorder apparently derives from a 1994 injury sustained while Debra was at work. Because the joint disorder causes pain in her knees, Debra is unable to exercise and lose weight, which would in turn alleviate the pain in her

knees. Debra's doctor first suggested that Debra consider having bariatric surgery in early 1999.[1] Debra reviewed her options with her doctor, and in the fall of 1999 they decided that she should have the surgery at the University of Washington hospital.

The University of Washington scheduled Debra for her first pre-surgery tests during the week of July 10, 2000. This date conflicted with the custody investigator interviews and Debra was unable to travel to Seattle for the pre-surgery tests. Debra then tried to schedule the surgery for the winter of 2000, but the University of Washington refused because of the weather in Alaska at that time of year, suggesting that the pre-surgery tests and the eventual surgery take place in the spring of 2001. Before trial, and while the parties were still legally married, Bernard wrote a letter to his health insurance company requesting that Debra be dropped from his employer-provided insurance policy. Thus, Debra has been unable to afford the surgery.

### B. Procedural History

When Bernard filed for divorce in January 2000, Debra maintained that she stood *in loco parentis* to both Brandon and Kristine and requested primary physical custody of Brandon and joint physical custody of Kristine. Superior Court Judge Ralph R. Beistline issued a standing order and preliminary injunction for domestic relations actions that restrained the parties from disposing of marital property.

Superior Court Judge Richard D. Savell ordered a custody investigation. The custody investigator quickly determined that Brandon would not be part of the investigation because he would be eighteen years of age before the investigation was complete.[2] The custody investigator ultimately concluded that Debra was the psychological parent of Kristine and recommended that the parties share legal and physical custody of Kristine. The custody investigator recommended

---

1. Bariatric surgery is a major surgery which reduces the size of the stomach and reroutes parts of the digestive system. The surgery takes three to five hours to perform, followed by a five- to seven-day stay in the hospital.

2. Brandon currently resides with Debra by his own choice.

that this shared custody consist of alternating weeks with each parent.

Bernard took the position at trial that he should have sole custody and that Debra should have no visitation with Kristine. He claimed that pursuant to the United States Supreme Court's recent decision in *Troxel v. Granville*,[3] Debra bore the burden of proving that Bernard is an unfit parent in order to maintain her claim to custody.

After a three-day trial in December 2000, the trial court found the evidence to be "overwhelming," even "uncontradicted," that Debra holds the place of a mother in Kristine's life. The trial court awarded the parties shared custody but withheld the divorce decree until after Debra's surgery so that she could retain her health insurance.

Bernard filed a motion to reconsider the trial court's decision to delay the decree of divorce to allow for Debra's surgery. Bernard supplemented the motion, arguing that Debra's surgery was purely elective and she should try dieting or exercise instead. The trial court granted the motion to reconsider and ordered that a divorce decree be entered. However, the trial court noted in its order that

> [Bernard's] removal of medical coverage before trial and without notice or leave of court has damaged [Debra] and violated the Presiding Judge's Standing Order. He will be liable for all costs incurred by [Debra] that would have been covered by insurance but for his wrongful acts. His liability may be enforced against his pension.

Bernard appeals the award of shared custody and the order holding him liable for the costs of Debra's medical care.

### III. STANDARD OF REVIEW

It is well settled that trial courts have broad discretion in determining child custody issues.[4] We will reverse a trial court's custody determination only if we are convinced that the trial court has abused its discretion or that controlling findings of fact are clearly erroneous.[5] An abuse of discretion may be found where the trial court considered improper factors, failed to consider statutorily mandated factors, or improperly weighed certain factors in making its determination.[6] A factual finding is clearly erroneous only when a review of the entire record leaves us with a firm conviction that the trial court has made a mistake.[7] With respect to questions of law, we apply our independent judgment and adopt the rule that is most persuasive in light of precedent, reason, and policy.[8]

### IV. DISCUSSION

#### A. The Finding that Debra Is the Psychological Parent of Kristine Is Not Clearly Erroneous.

The trial court found that Debra had become Kristine's psychological parent. After concluding "that Debra Kinnard holds a place in [Kristine's] life that is of equal or even greater importance than a natural mother," the trial court added that "[i]f this were a contest between two natural parents ... [Bernard] would be stripped of custody of this child." The trial court further emphasized: "Not only by a preponderance of the evidence, not by clear and convincing evidence, but this court finds beyond any reasonable doubt that removal of Debra Kinnard from [Kristine's] life would be devastating to [her]."

Bernard first argues that there is insufficient evidence to support the trial court's finding that Debra is Kristine's psychological parent. In particular, he argues that there was little evidence of Kristine's attitude or feelings toward Debra. In *Carter v. Brodrick*, we recognized the concept of

3. 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

4. *Valentino v. Cote*, 3 P.3d 337, 339 (Alaska 2000).

5. *Holl v. Holl*, 815 P.2d 379, 380 (Alaska 1991).

6. *Pearson v. Pearson*, 5 P.3d 239, 242 (Alaska 2000).

7. *Money v. Money*, 852 P.2d 1158, 1161 (Alaska 1993).

8. *Vachon v. Pugliese*, 931 P.2d 371, 375 (Alaska 1996).

psychological parenthood, which "finds its legal basis either explicitly or implicitly in the common law doctrine of in loco parentis."[9] In contrast to Bernard's current argument that the doctrine of *in loco parentis* must be based exclusively upon the child's feelings and attitude towards the stepparent, in *Carter*, we relied on a description of a psychological parent as "one who, on a day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological need for an adult."[10] Whether a stepparent has assumed the status of a psychological parent "depends on whether that person intends to assume that obligation."[11] Thus, the perspectives of both the stepparent and the child on this mutual, parent-child bond are relevant. In *Carter*, we concluded that under Alaska law, "those relationships that affect the child which are based upon psychological rather than biological parentage may be important enough to protect through custody and visitation, to ensure that the child's best interests are being served."[12]

■ Many witnesses at trial testified to Debra's status as a psychological parent of Kristine. Kristine had lived with Bernard and Debra from the time that she was in kindergarten, and Bernard admitted that Debra and Kristine "had bonded together" from the beginning of their relationship. Two expert witnesses as well as the custody investigator testified that Debra and Kristine's relationship was that of parent and child; indeed, the custody investigator concluded that Debra was a psychological parent to both Kristine and Brandon. There is ample evidence in the record to support the trial court's finding that Debra was Kristine's psychological parent, and that finding is not clearly erroneous.

### B. The Trial Court Applied the Proper Legal Standard.

Bernard maintains that even if Debra is the psychological parent of Kristine, the trial court applied an improper standard to determine custody. Bernard contends that the trial court applied the "best interests" test, when it should have applied the "detrimental to the welfare of the child" test. The former, he argues, only applies when the custody dispute is between two biological parents, while the latter applies when the dispute is between a parent and a third party.

But Bernard appears to have misunderstood the trial court's actions and findings. Although the trial court initially suggested that the "best interests" test would apply, after briefing by both parties the court ultimately applied a different standard. The trial court explicitly recognized the distinction between the "best interests" and "detriment" standards when it stated that "[i]f this were a contest between two natural parents, and the actions and behaviors of the parties were as they are here, [Bernard] would be stripped of custody of this child." The court then found "beyond any reasonable doubt that removal of Debra Kinnard from [Kristine's] life would be devastating to the child" and "[w]ould cause severe and irreparable harm."

■ We discussed the proper standard for determining custody between a biological parent and a third party in *Turner v. Pannick*.[13] We concluded that parental custody is preferable and only to be refused where "it clearly would be detrimental to the child."[14] The child's biological parent must be awarded custody unless the trial court determines that the parent is unfit, has abandoned the child, or that the welfare of the child requires that a non-parent receive custody.[15] Even in custody disputes between parents and stepparents, the best interests standard is rejected in favor of the *Turner* parental preference. Therefore, the *Turner* standard is the proper standard for this case.

9. 644 P.2d 850, 853 (Alaska 1982).

10. *Id.* at 853 n. 2 (quoting Gruenberg & Mackey, *A New Direction for Child Custody in Alaska,* 6 U.C.L.A.-Alaska L.Rev. 34, 36 (1976)).

11. 644 P.2d at 853.

12. *Id.* at 855.

13. 540 P.2d 1051 (Alaska 1975).

14. *Id.* at 1054.

15. *Id.* at 1054–55.

Here, although the trial court did not specifically refer to *Turner*, it did emphasize that removing Debra from Kristine's life altogether would "cause severe and likely irreparable harm" to Kristine. As we recognized in *Buness v. Gillen*, "severing the bond between the psychological parent and the child may well be clearly detrimental to the child's welfare."[16] Thus, the trial court properly examined both the extent of the strong emotional bond between Debra and Kristine and the question of whether severing that bond would be detrimental to Kristine. It is evident that the trial court applied the correct standard in its finding that removing Debra from Kristine's life altogether would be not only detrimental but also devastating to the child. The trial court thus properly applied the *Turner* standard.

### C. The Trial Court's Analysis Does Not Conflict with *Troxel v. Granville.*

Bernard next argues that even if the trial court properly applied the *in loco parentis* doctrine of *Carter* and *Buness*, that doctrine "has been modified" by *Troxel v. Granville.*[17] He explains that "[i]n essence, a portion of AS 25.24.150(a) has been found unconstitutional by the United States Supreme Court." In *Troxel*, the Supreme Court ruled that Washington's grandparent visitation statute was unconstitutional as applied.[18] Bernard relies on *Troxel* to challenge the constitutionality of AS 25.24.150(a), which contemplates orders providing "for visitation by a grandparent or other person if that is in the best interests of the child." But AS 25.24.150(a) did not form the basis for the trial court's ruling in this case, and, therefore, its constitutionality is not properly before us in this appeal. As noted above, the trial court did not rely on the best interests standard, instead implicitly employing the tests of *Carter v. Brodrick* and *Turner v. Pannick* to determine that Debra is Kristine's psychological parent and that loss of this parent-child bond would have a devastating effect on Kristine. And *Troxel* involved neither a claim of psychological parenthood nor a determination that depriving the child of a psychological parent would negatively affect the welfare of the child.[19] Therefore, the trial court's ruling does not run afoul of the holding in *Troxel.*

### D. The Order for Medical Payment Was Within the Trial Court's Broad Discretion.

At the start of this divorce proceeding, Presiding Judge Beistline issued a standing order restraining the parties from

> [d]isposing of, encumbering, or transferring any marital property without the written consent of the other party, except reasonably using funds for the parties' expenses or for the personal and necessary expense of the children.

While the parties were still married, and before trial began, Bernard contacted his employer-provided health insurer and directed that Debra be removed from his insurance policy effective November 30, 2000. The insurer removed Debra from Bernard's policy, and without proof of insurance Debra was unable to afford the recommended surgery.

The fact that Debra was removed from Bernard's coverage did not surface until the end of trial in December 2000. When questioned by the trial court, Bernard asserted that, although he was not sure if he would now be able to reinstate Debra's coverage, he would try. The trial court, presuming Bernard would restore Debra to his health insurance, announced its intent to delay entering the divorce decree until after Debra's surgery. The trial court characterized this as "a fair and compassionate and economically practical thing to do," reasoning that, in the absence of any proof of harm to Bernard, there was no reason to issue the decree until after the surgery.

Bernard filed a motion for reconsideration requesting that the decree of divorce be entered immediately; this motion was granted in January 2001. However, the trial court

---

16. 781 P.2d 985, 989 n. 8 (Alaska 1989).

17. 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

18. *Id.* at 66–67, 120 S.Ct. 2054

19. *Id.* at 60–63, 120 S.Ct. 2054.

noted in its order that Bernard had "damaged [Debra] and violated the Presiding Judge's Standing Order" and that Bernard would be liable for all of the costs of the surgery that would have been covered by the health insurance. The trial court added that Bernard's liability "may be enforced against his pension." In its final ruling, entered on May 2, 2001, the trial court elaborated on its earlier order regarding payment of Debra's medical expenses:

> [T]he court finds that Bernard dropped Debra from his employer-provided health insurance coverage before trial without notice to her and in violation of the court's standing domestic relations order. If Bernard is unable to restore Debra to his insurance coverage through his employment, any surgery costs that Debra incurs during 2001 for planned surgery will be paid for out of Bernard's remaining share of his pension. If the cost of Debra's surgery exceeds the total amount of Bernard's share of his pension plan, the marital portion of Bernard's ... 401(k) pension plan shall be distributed to Debra in its entirety (100%), provided that the surgery is performed by December 31, [2001]. The Court will retain jurisdiction to enter a QDRO after December 31, 2001.

### 1. Bernard violated the trial court's standing order.

■ Bernard first claims that he did not violate the standing order because health insurance is not "property" under the standing order and was therefore not protected by the order. He asserts that he has no control over the health insurance in that he cannot sell or transfer it, and it has no cash value. But in *Brooks v. Brooks*, we implied that health insurance should be treated as a marital asset.[20] There, the wife cancelled her

husband's coverage under her medical insurance policy, and we approved the superior court's response to this depletion of a marital asset: giving the husband a credit for his uncovered medical expenses. We conclude that unilateral removal of a spouse from one's health insurance policy constitutes dissipation of a marital asset.[21]

■ Coverage under a health insurance policy is a marital asset. The presiding judge's standing order specifically directed the parties not to dispose of marital property. Bernard, by disposing of Debra's health insurance, violated that order.

### 2. The trial court's order that Bernard either reinstate Debra's coverage or pay her medical bill was within its broad discretion.

■ Bernard claims that, by ordering him to reinstate Debra's coverage under his policy or pay her surgery costs out of his half of the pension, the trial court awarded Debra an unequal share of the marital property. Bernard further contends that awarding a portion of his pension share to Debra to cover the costs of surgery is not an appropriate remedy because it is "unjustifiably punitive." But Bernard had several options for remedying his unilateral act, including rescinding his letter to the insurance company, paying for COBRA coverage long enough to cover the operation, or paying for the surgery from his own resources. Bernard's retirement account was to be used only if he did not take advantage of the other options available.

Moreover, the trial court's order was entirely within the scope of its authority to fairly allocate the economic consequences of the divorce.[22] Under AS 25.24.160(a)(4),

20. 677 P.2d 1230, 1235 (Alaska 1984).

21. Commentators have recognized a sound policy basis for treating health insurance as an asset for the spouse who is insured. *See, e.g.,* William R. Horbatt & Alan M. Grosman, *Division of Retiree Health Benefits on Divorce: The New Equitable Distribution Frontier,* 28 Fam. L.Q. 327, 327–28 (1994); *see also* Elizabeth L. Bennett & John W. Goldsborough, *Guaranteeing Medical Insurance Coverage After Separation or Divorce,* 28

Fam. L.Q. 305 (1994) (demonstrating valuation of medical retirement benefits).

22. *See* AS 25.24.160(a)(4), which provides in part:
> [T]he division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors:
>
> . . . .
>
> (E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets.

when dividing the marital property the trial court is directed to consider the parties' health, their earning capacities, their financial conditions including the availability and cost of health insurance, as well as any unreasonable depletion of the marital assets.[23] Thus, the trial court's order, rather than punishing Bernard, properly considered the statutory criteria and compensated Debra for the premature loss of health insurance. The trial court placed Debra in the position she would have been in had Bernard not removed her from his insurance. This order was well within the court's statutory authority as well as within its general equitable authority.[24]

## V. CONCLUSION

For the foregoing reasons, the decision of the trial court is AFFIRMED in all respects.

---

**23.** AS 25.24.160(a)(4)(B)-(E).

**24.** *See Siggelkow v. State,* 731 P.2d 57, 61–62 (Alaska 1987).