*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JAYDA ROMAN, | ) |
| | ) Supreme Court No. S-17310 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-15-06949 CI |
| v. | ) |
| | ) O P I N I O N |
| CLEVELAND KARREN, | ) |
| | ) No. 7441 – April 17, 2020 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Bradly A. Carlson, Law Office of Bradly A. Carlson, Anchorage, for Appellant. Rhonda F. Butterfield and Douglas M. Ryan, Wyatt & Butterfield LLC, Anchorage, for Appellee.

Before: Winfree, Stowers, Maassen, and Carney, Justices. [Bolger, Chief Justice, not participating.]

WINFREE, Justice.

## I.     INTRODUCTION

A mother appeals the superior court's child custody order, arguing that the court lacked subject matter jurisdiction under the Uniform Child Custody Jurisdiction

and Enforcement Act (UCCJEA)[1] or that it abused its discretion by failing to decline UCCJEA jurisdiction on inconvenient forum grounds. She also contends that the court gave disproportionate weight to the custody investigator's trial testimony and, under the statutory custody factors, to maintaining the father-daughter relationship.

We conclude that the superior court had UCCJEA jurisdiction because Alaska was the child's home state when the proceeding commenced; we also conclude that the court properly weighed the statutory inconvenient forum factors and did not abuse its discretion when it determined that deciding custody in Alaska was most practical. And because the court has broad discretion in making a custody determination — including the weight to give a custody investigator's testimony — we conclude the court did not abuse its discretion when weighing either testimony or statutory custody factors. As detailed below, first addressing the relevant facts and proceedings regarding the UCCJEA jurisdictional determination and then the relevant facts and proceedings regarding the custody determination, we affirm the superior court's child custody order.

## II.     UCCJEA ISSUES

### A.     Facts And Proceedings

Cleveland Karren and Jayda Roman have a daughter, who was born in March 2012 in Washington, D.C. Jayda and the daughter moved in July to Mount Vernon, Washington, to live with Jayda's parents. The family moved to Anchorage in April 2013. Cleveland later took a job at Joint Base Lewis-McChord; he moved to Washington in April 2014, and Jayda remained in Anchorage with the daughter. In May 2015 Cleveland took a different job and moved to Washington, D.C.

---

[1]     The UCCJEA is codified at AS 25.30.300-.910.

### 1. May 2015 petition for marriage dissolution

Jayda filed the parties' marital dissolution petition in Anchorage in May 2015.[2] The daughter's prior residences were listed as Washington, D.C. from birth until July 2012; Mount Vernon from July 2012 until April 2013; and Anchorage from April 2013 to the dissolution petition's date.

In July a magistrate judge held a marriage dissolution hearing. Jayda and Cleveland appeared telephonically, and they each notified the court of their moves outside of Alaska. Jayda testified that she and the daughter were living in Washington. Cleveland initially requested that child support issues be transferred to a Washington court. Jayda responded that she and their daughter were "still Alaska residents." Jayda's attorney interjected that Jayda still was an Alaska resident, that Jayda had filed the dissolution petition prior to moving outside of Alaska, and that Jayda had physically removed herself and the daughter from Alaska only a month or two before.

Jayda and Cleveland testified that they both had "live[d] in Alaska six continuous months out of the past six years." The magistrate judge made an oral finding that the Alaska superior court had subject matter jurisdiction, but Jayda and Cleveland then could not agree on custody and child support. The superior court subsequently converted the dissolution proceeding into a divorce proceeding, directed Jayda to file a complaint, and scheduled a November status conference.

### 2. Subsequent proceedings

At the November hearing, Jayda's counsel notified the court that Cleveland, who was self-represented, was living in Washington, D.C. but that his hearing notice had been mailed to a previous address in a state where he no longer lived. Cleveland did not

---

[2] AS 25.24.200(a) ("A husband and wife together may petition the superior court for the dissolution of their marriage.").

appear, and the court could not reach him by telephone. Jayda testified that she had been living in Washington but had moved back to Alaska "because of jurisdiction" and because she believed she and the daughter were "better off" in Alaska. Jayda clarified that she had left Alaska for five-and-a-half months, returned in September, and intended to remain.

The court finalized the divorce, granted Jayda primary physical and sole legal custody of the daughter, and issued an order setting Cleveland's child support obligation. Cleveland almost immediately thereafter notified the court that he had not received proper notice of the hearing or what it was for, and he asked the court to set aside its orders. The court later granted Cleveland's request, under Alaska Civil Rule 60(b)(4).[3]

In June 2016 Jayda filed — in the same case — a divorce complaint. Jayda alleged, and Cleveland admitted in his answer, that she and the daughter were Alaska residents and that the Alaska superior court had subject matter jurisdiction. In August Jayda filed a notice that she had "accepted a job . . . while traveling on summer vacation with her daughter. It will start mid[-]August" in Spokane, Washington. Jayda noted that although her new address was in Spokane, "the child is still subject to Alaska jurisdiction under the [UCCJEA]."

At a February 2018 trial setting conference, Jayda sought to transfer the case to Washington, testifying that she had moved there in August 2016 and that she and

---

**3** Rule 60(b)(4) provides that a party may move for relief from a "final judgment, order, or proceeding" if the judgment is void. A judgment may be void if "the defendant was not given proper notice of the action and opportunity to be heard." *Heber v. Heber*, 330 P.3d 926, 930 (Alaska 2014) (quoting *Leisnoi, Inc. v. Merdes & Merdes, P.C.*, 307 P.3d 879, 891 (Alaska 2013)).

the daughter had resided there continuously for the previous 18 months. The superior court bifurcated the divorce and custody issues and set trial for both.

### 3. April 2018 UCCJEA conference

At some point Jayda filed a custody petition in Washington; in April the superior court held a custody jurisdiction conference with the Washington court. Cleveland argued that the Alaska court retained jurisdiction and that Jayda had alleged in her divorce complaint that she and the daughter were Alaska residents as of June 2016. Cleveland contended that Jayda was forum shopping because she did not like recent events in the Alaska proceedings.

Jayda's Washington-based attorney asserted that Jayda and the daughter had moved to Washington in June 2016 and that jurisdiction now was proper only in Washington. Acknowledging that Alaska was the daughter's home state initially in 2015, Jayda's Washington attorney conceded the court's initial jurisdiction to enter its November 2015 determination. But Jayda's attorney asserted that "when the Alaska court vacated all of its orders related to the parenting of the child, and the child left the state and established residence in Washington, jurisdiction [became] only proper in the child's home state" of Washington. Jayda's Alaska-based attorney argued that "Alaska [was] now functionally an inconvenient forum" because the witnesses and evidence were in Washington and "[n]obody [would be] coming up here [to Alaska] to try the case."

The Washington court believed both Alaska and Washington could be considered the daughter's home state under the UCCJEA, and Alaska could retain exclusive, continuing jurisdiction unless the parties no longer resided in Alaska and the court did not want to retain jurisdiction. Focusing primarily on the inconvenient forum factors, the Washington court noted that the Alaska court was familiar with the case and had a custody trial scheduled the following month. Although Jayda wanted to finalize

the divorce in Alaska and litigate custody in Washington, the Washington court thought that parallel proceedings could burden the parties with significant attorney's fees.

The superior court considered the statutory inconvenient forum factors,[4] explaining that the litigation was "right on the cusp of [a] decision" and that it would be unwise to "pull up the stakes and defer a decision for" nearly a year and spend additional money obtaining new attorneys in Washington. And noting "an assumption that once you have initial jurisdiction, you take it to the conclusion and reach a decision," the court was "persuaded that the [c]ourt has initial jurisdiction and continuing jurisdiction." The court decided that it would retain jurisdiction because of the "substantial amount of litigation" already completed and the upcoming custody trial. The Washington court subsequently dismissed Jayda's custody action.

### 4. Divorce decree, custody orders

The superior court issued a divorce decree in May 2018. The court found that Jayda and the daughter had been residents of "the State of Alaska for at least six months prior to the filing of the divorce complaint." Following a separate custody trial, the court awarded primary physical custody to Cleveland with visitation to Jayda.

### 5. Appeal

Jayda appeals, arguing that the court lacked subject matter jurisdiction under the UCCJEA or abused its discretion by failing to decline UCCJEA jurisdiction on inconvenient forum grounds.

---

[4]     *See infra* note 20 and accompanying text.

## B. Standard Of Review

Subject matter jurisdiction is a question of law that we review de novo.[5] The issue of subject matter jurisdiction "may be raised at any time during litigation."[6] Subject matter jurisdiction cannot be waived, because a court without jurisdiction is without power to decide the case.[7] We review a superior court's decision to exercise or decline jurisdiction based on inconvenient forum for abuse of discretion.[8] A superior court abuses its discretion by making a decision that is arbitrary, capricious, or manifestly unreasonable or that stems from an improper motive.[9]

## C. Discussion

### 1. Superior court's initial jurisdiction

The UCCJEA limits a court's jurisdiction in custody matters to promote uniformity among courts in different states.[10] The superior court has three ways to assert home state jurisdiction to make an initial child custody determination.[11] First, the court has jurisdiction if Alaska was "the home state of the child on the date of the

---

[5]    *B.J. v. J.D.*, 950 P.2d 113, 115 (Alaska 1997); *see also Steven D. v. Nicole J.*, 308 P.3d 875, 879 (Alaska 2013) (applying de novo jurisdiction review under UCCJEA).

[6]    *B.J.*, 950 P.2d at 115 (quoting *O'Link v. O'Link*, 632 P.2d 225, 226 n.2 (Alaska 1981)).

[7]    *Wanamaker v. Scott*, 788 P.2d 712, 713 n.2 (Alaska 1990).

[8]    *Steven D.*, 308 P.3d at 879.

[9]    *Sharpe v. Sharpe*, 366 P.3d 66, 68 (Alaska 2016).

[10]    *Atkins v. Vigil*, 59 P.3d 255, 257 (Alaska 2002).

[11]    AS 25.30.300(a); *see Norris v. Norris*, 345 P.3d 924, 928-29 (Alaska 2015) (discussing three relevant ways court can gain jurisdiction).

commencement of the proceeding."[12] Second, the court has jurisdiction if Alaska "was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent . . . continues to live in this state."[13] Third, the court may have jurisdiction when no other state has jurisdiction under the first two provisions if the child and at least one parent have a significant connection to the state and substantial evidence relevant to the child's care is located in the state.[14]

Jayda acknowledges that when she filed the May 2015 dissolution petition, the daughter "lived in Alaska with Jayda and Cleveland lived in Washington." But Jayda argues that once the court vacated the November 2015 child custody and support orders, her June 2016 divorce complaint commenced a new proceeding under the UCCJEA, and she contends that the court was required to reconsider child custody jurisdiction as of that date. Jayda argues that because she and the daughter then were in Washington and Cleveland was in Washington, D.C., the Alaska court no longer had subject matter jurisdiction to make an initial custody determination.[15] Cleveland counters that the

---

[12] AS 25.30.300(a)(1); *see* AS 25.30.909(7) (defining "home state" as "the state in which a child lived with a parent . . . for at least six consecutive months, including any temporary absences of the child or parent . . . , immediately before the commencement of a child custody proceeding").

[13] AS 25.30.300(a)(2).

[14] AS 25.30.300(a)(3).

[15] Jayda alternatively argues that even if the superior court had initial child custody jurisdiction, it did not have exclusive, continuing jurisdiction once the parties left Alaska. Alaska Statute 25.30.310 provides that once an Alaska court has made a child custody determination consistent with initial child custody jurisdiction, it "has exclusive, continuing jurisdiction" over that determination except under certain circumstances. This statute relates to the court's authority *after* it makes an initial child custody determination. AS 25.30.310; *see also* AS 25.30.320. But the court's
(continued...)

-8-                                                                                          **7441**

record shows Alaska was the daughter's home state when Jayda filed the June 2016 divorce complaint and that the court properly made the initial child custody determination.

The parties misidentify the relevant date for determining the daughter's home state. The UCCJEA defines a child custody proceeding as one in which "legal custody, physical custody, or visitation with respect to a child is an issue," including divorce or separation proceedings.[16] Jurisdiction therefore attached if the daughter had lived in Alaska for at least six consecutive months, including any temporary absences, immediately before the May 2015 dissolution proceeding commenced.[17] The original dissolution proceeding was never closed, it simply was converted into a divorce proceeding. The case continued with the same parties, case number, judge, and trial record. The child custody proceeding therefore commenced in May 2015 when Jayda sought to dissolve the marriage and first raised the child custody issue.

The parents stated in the dissolution petition that the daughter had resided uninterrupted in Alaska since 2013. In July 2015 Jayda testified that she and the daughter were Alaska residents and had lived in Alaska for six consecutive months in the past six years. In November 2015 Jayda testified that she had been in Washington for

---

[15]    (...continued) jurisdiction to enforce or modify the child custody order is not at issue in this case. Jayda instead challenges the court's jurisdiction to make the initial child custody determination, which we review under the relevant statute, AS 25.30.300.

[16]    AS 25.30.909(4); *see also Atkins v. Vigil*, 59 P.3d 255, 257 (Alaska 2002) (noting that under UCCJEA "[a] child's home state is determined at the time an action commences").

[17]    *See* AS 25.30.300(a)(1); AS 25.30.909(7). The superior court also appears to have considered May 2015 the date the proceeding commenced, noting Jayda "retained local counsel and initiated the present action in Anchorage in 2015."

less than six months before moving back to Alaska and that she intended to remain in Alaska. The record thus demonstrates that Alaska was the daughter's home state when Jayda filed the dissolution petition in May 2015, and the superior court had initial jurisdiction under AS 25.30.300. Issuing, and later vacating, the November 2015 child custody order did not eviscerate the court's UCCJEA jurisdiction to issue the initial child custody order in the continuing proceedings.

### 2. Superior court's exercise of discretion

Alaska's inconvenient forum statute for child custody determinations provides: "A court of this state that has jurisdiction . . . may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum."[18] This provision notably is discretionary.[19] A court with initial child custody jurisdiction may find that it is an inconvenient forum and transfer the case after considering "all relevant factors."[20] The full list of factors includes:

> (1) whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;
>
> (2) the length of time the child has resided outside this state;
>
> (3) the distance between the court in this state and the court in the state that would assume jurisdiction;
>
> (4) the relative financial circumstances of the parties;

---

[18] AS 25.30.360(a).

[19] *See Steven D. v. Nicole J.*, 308 P.3d 875, 879 (Alaska 2013) ("A superior court's decision to decline, or to refuse to decline, jurisdiction as an inconvenient forum is reviewed for abuse of discretion.").

[20] AS 25.30.360(b).

(5) an agreement of the parties as to which state should assume jurisdiction;

(6) the nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

(7) the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and

(8) the familiarity of the court of each state with the facts and issues in the pending litigation.[21]

Jayda contends that the superior court abused its discretion by failing to decline jurisdiction based on inconvenient forum grounds. Jayda argues that the court "placed too much emphasis on the cost of litigation and on anticipated judicial efficiency and not [on] what forum was in the best position to decide [the daughter's] best interest." Cleveland counters that at the UCCJEA hearing the court properly weighed the relevant inconvenient forum factors and discussed them with the Washington court and the parties' attorneys.

When deciding whether to decline jurisdiction on inconvenient forum grounds, the superior court is not required to make a best interests analysis.[22] But a court

---

[21] AS 25.30.360(b).

[22] *Mikesell v. Waterman*, 197 P.3d 184, 191 (Alaska 2008) (holding under UCCJEA that "the superior court was not required to make a best interests analysis in deciding whether to decline jurisdiction" because UCCJEA, unlike its precursor, removed child's best interests as factor in both inconvenient forum and initial jurisdiction questions).

Jayda relies on *Szmyd v. Szmyd* for her assertion that the superior court abused its discretion by denying her inconvenient forum motion. 641 P.2d 14 (Alaska 1982). We held in *Szmyd* that the superior court abused its discretion by declining to dismiss that case when the mother and child had moved to California and Alaska was an inconvenient forum. *Id.* at 15-16, 21-22. But the relevant statutory factors were from

(continued...)

denying an inconvenient forum motion must provide a statement of reasons for its ruling.[23]

The superior court carefully considered whether Alaska was an inconvenient forum. There was extensive discussion about the length of time the daughter, as well as her parents, had been outside Alaska. There was no dispute that the parties no longer were Alaska residents. But the court explained that the parties' attorneys, who had done substantial work, were not licensed in Washington. The court had appointed a Washington-based custody investigator, who, along with most of the witnesses outside Alaska, could testify telephonically. The court reasoned that transferring the case would cause an approximately one-year delay for the parties to obtain Washington attorneys and a new court to become familiar with the issues. The court ultimately concluded that the inconvenient forum analysis was a "balancing act" weighing in favor of it retaining jurisdiction because of the "substantial amount of litigation in this case" and the trial scheduled for the following month.

We already have concluded that the superior court properly determined it had initial child custody jurisdiction. When deciding whether Alaska was an inconvenient forum, the court considered all statutory factors. Our role is not to

---

[22]    (...continued) the UCCJEA's precursor, *id.* at 15-20, focusing on the "child's best interests"; the UCCJEA removed that consideration. UCCJEA § 201 cmt. 2.

[23]    *Szmyd*, 641 P.2d at 19 ("We are requiring the statement of reasons as an aid to the parties in understanding the trial court's decision and as an aid to this court in carrying out its review function."); *see also Steven D.*, 308 P.3d at 884 (holding that although *Szmyd* was based on UCCJEA's predecessor, requirement that court articulate reasoning for denying inconvenient forum motion remains good law).

substitute our judgment for the court's discretionary decision; the superior court's reasoning was not clearly unreasonable, and we therefore see no abuse of discretion.[24]

## III. CUSTODY ISSUES

### A. Relevant Facts And Proceedings

#### 1. Background

The family moved to Anchorage in 2013 and lived there together for about a year. Cleveland subsequently took a job in Washington and lived there for about a year, while Jayda remained in Anchorage with the daughter. Cleveland was located about a two-hour drive from Jayda's parents; he saw the daughter occasionally when she visited Jayda's parents. In May 2015 Cleveland took a different job and moved to Washington, D.C.

About the time Cleveland moved to Washington, D.C., Jayda began a new relationship; she and the daughter later moved in with Richard C. and his children. The daughter began referring to Richard as "Dad," greatly upsetting Cleveland. Jayda believed the daughter was only imitating Richard's children, but Jayda did not discourage this practice. Jayda and Cleveland agreed that he would have video calls with the daughter three times weekly. They soon began arguing over the calls. Cleveland later testified that Jayda would exercise "pure whim" to deny his call if he were one minute too early or too late and that when he worked overseas she would not accommodate his schedule. Jayda later testified that Cleveland became hostile, disparaging her and Richard.

Cleveland had only one in-person visit with the daughter in 2015, for a week in the summer. Plans were made for the daughter to visit Cleveland in August for

---

[24] *Rice v. McDonald*, 390 P.3d 1133, 1137 (Alaska 2017) (noting we will overturn discretionary inconvenient forum ruling if reasons for exercise of discretion are clearly untenable or unreasonable).

two or three weeks in Washington, D.C., and he requested her medical records to enroll her in daycare. Jayda refused to provide the records and later canceled the visit.

Jayda invited Cleveland to have supervised visits with the daughter during her birthday week in March 2016. But they began arguing about the timing of the visits, and Cleveland ultimately canceled the visits. In May Cleveland had a visit while the daughter was staying for a week with Jayda's parents in Washington. Cleveland later testified that Jayda would not allow him overnight visits; he picked up the daughter in the morning, spent the day with her, then returned her to Jayda's parents in the evening.

Cleveland later testified that, following a court decision adverse to Jayda, she reduced his video calls with the daughter from three to two weekly. They continued arguing about the calls. Jayda later testified that Cleveland would argue with her about any schedule change, that it was hard to accommodate the calls because of her busy life with Richard and his children, and that calls frequently took place while the daughter was in a grocery store, car, or restaurant.

In summer 2017 Jayda flew with the daughter to Washington, D.C. so that Cleveland could have a visit for just over a week   Cleveland later testified about events when he met them at the airport:  Jayda asked to inspect his car and car seat, but he had taken public transportation; Jayda also asked to inspect his home, and when he refused she taunted him in front of the daughter.

### 2. Custody investigator report

The superior court appointed Washington-based custody investigator Karen Schweigert to complete an investigation and make a placement recommendation.[25] Schweigert issued her report in December 2017. Schweigert noted that both parents had

---

[25]   *See* Alaska R. Civ. P. 90.6(a) (authorizing court to appoint expert to investigate custody, access, and visitation issues and provide independent opinion concerning child's best interests).

"engaged in behaviors that have not been in [their daughter's] emotional best interests." Schweigert focused primarily on Jayda's attempts to undermine Cleveland's relationship with the daughter, noting: "The issue of [the daughter] calling [Richard] 'daddy' continues to be a significant source of conflict between the households — and [she] is suffering because neither side is willing to make her comfort more of a priority than the ego of the adults/battle between the adults over this designation."

Schweigert recommended that Jayda have primary physical custody of the daughter but that the parties share legal custody. Schweigert expressed concern that if Jayda secured sole legal custody, she would exclude Cleveland from the daughter's life. Schweigert further recommended that the court make a finding that Jayda and Richard had interfered with the daughter's relationship with Cleveland and order parenting restrictions on Jayda for her "abusive use of conflict." Schweigert emphasized the damage Jayda's conflict with Cleveland was causing: "If [Jayda] does not comply with restrictions or otherwise continues to engage in acts (or permit [Richard] to engage in acts) that interfere with [Cleveland's] parental relationship . . . , a change in primary placement may be the only way to preserve and protect [the daughter's] relationship with [Cleveland]." Schweigert did not believe that a placement change was in the daughter's best interests at that point because Jayda was the daughter's primary attachment figure and had improved her behavior in response to the litigation process.

Schweigert also mentioned allegations that Jayda once had punched a wall and occasionally had thrown items, such as plates, during arguments with Cleveland. Relying on these allegations, Cleveland subsequently notified the superior court that Jayda was subject to a domestic violence presumption against obtaining custody.[26]

---

[26] *See* AS 25.24.150(g)-(j) (establishing rebuttable presumption against awarding custody to parent with history of perpetrating domestic violence against other

(continued...)

### 3. Subsequent events

#### a. Spring break visit

Cleveland obtained an order to have a spring break visit in April 2018 in Washington. The superior court authorized Jayda "the same schedule of Skype/phone visits" twice weekly with the daughter as Cleveland had when she was in Jayda's custody. The court prohibited Richard from being present at exchanges or having contact with Cleveland. During the visit the daughter had contact with Jayda almost daily. Cleveland later testified about calls being unreasonably lengthy and Jayda focusing on "missing" their daughter, saying, "I have no control over this," and "[I]t's your dad, [and] [y]ou have to be there." Despite the order that Richard not have contact, Cleveland saw Richard filming video calls between the daughter and Jayda.

#### b. Divorce decree; summer visit

The superior court issued a divorce decree in May 2018, scheduling a separate custody trial for September. The court meanwhile ordered that Cleveland have summer visitation with the daughter. Jayda gave the daughter an iPad and a cell phone to use during the visit. Cleveland later testified that Jayda's calls and text messages became excessive. He said that Jayda would include Richard or her mother in a three-way call; if the daughter appeared upset, Jayda would say: "We didn't want you to come, but the [c]ourt's making us. You need to be brave [and] strong."

#### c. Supplemental custody investigator report

Schweigert submitted a supplemental report in August 2018, updating the superior court following the spring and summer visits. Schweigert reported that Jayda had refused to provide Cleveland the daughter's medical records because "he might use

---

[26] (...continued)
parent and limiting visitation upon domestic violence finding).

that information to keep [her]" and that Jayda was allowing the daughter to use Jayda's maiden name rather than her legal paternal name. Schweigert reported that Jayda also admitted Richard's involvement in video calls during the daughter's summer visit with Cleveland.

Schweigert reported statements by the daughter's counselor that the counselor "spends a considerable amount of time trying to manage [Jayda's] anxiety" and that the counselor felt it was inappropriate for Jayda to provide a cell phone and unlimited text messaging because it was undermining Cleveland's relationship with the daughter. Schweigert also noted the counselor's recommendations that "if [Jayda] remains the primary custodial parent, [she] will need ongoing individual counseling to help her co-parent effectively" and that Cleveland "may need individual counseling to address his hostility."

### 4. Custody trial

The superior court held a custody trial in September and October 2018. Testimony of Jayda, Cleveland, and Schweigert is summarized as follows.

#### a. Jayda

Jayda testified that Cleveland was not present in their lives when the daughter was first born because he was "career-driven." Jayda said she was doing the "best" she could to facilitate the relationship between Cleveland and the daughter, although she admitted she frequently held video calls between them in areas that could be distracting. Jayda also acknowledged allowing the daughter to call Richard "Dad." Jayda believed that she had "changed" over the course of the litigation and that she exhibited better behavior toward Cleveland.

#### b. Cleveland

Cleveland testified about his efforts to maintain a relationship with the daughter, despite Jayda's preventing his weekly phone calls. He testified that if the court

granted him primary physical custody, he had arrangements for her to move to Washington, D.C., he would "encourage having her mother involved," and he would be "totally happy with her mother having full summers" and regular weekly calls. Cleveland acknowledged that "some of [Jayda's] most aggressive behavior ha[d] stopped" but said that she still prevented him from having a relationship with the daughter.

### c. Custody investigator

Schweigert testified that since her December 2017 report, she had become more concerned about Jayda retaining custody of the daughter. Schweigert held the opinion that Cleveland should have custody. Although Schweigert criticized some of Cleveland's behavior, she was much more concerned about Jayda's conduct. Schweigert believed Jayda's behavior was "as good as the behavior is going to be." Schweigert noted her discussion with the daughter's counselor, who felt Jayda would require counseling to modify her behavior but believed change was unlikely.

Schweigert further testified that Richard's "involvement has been a significant catalyst for problems between the households." Schweigert believed that Jayda's involving Richard "seemed designed to antagonize [Cleveland] and to also try to escalate things." Schweigert "didn't find credible" Jayda's explanation of why she would not disclose the daughter's medical records to Cleveland. Schweigert found it disconcerting that, despite having withheld the medical records, Jayda criticized Cleveland's parenting skills when the daughter's eczema flared up while in his care.

Schweigert described the status of Jayda's attempts to alienate the daughter from Cleveland: "[The daughter] is not yet successfully alienated. She still wants to spend time with her father. She enjoys her time with her father, but she seems to be becoming more visitation-resistant, which is a huge red flag." Schweigert believed that

if the daughter's "relationship with her father is going to be preserved and protected, [there isn't] another alternative except for [the daughter] being placed with [Cleveland]."

Schweigert said she had observed nothing indicating Cleveland would not be a successful, full-time father. Schweigert observed that the daughter was "appropriately attached to" Cleveland despite the limited time the two had spent together and that he historically was "very good about facilitating communication between" the daughter and Jayda.

### 5. Superior court's findings

The superior court made oral findings at the trial's conclusion. The court focused on Schweigert's testimony, noting its agreement with Schweigert's opinion that placing the daughter with Cleveland was necessary to protect the father-daughter relationship: "[T]he prime . . . factor in the custody investigator's decision was her lack . . . of any real confidence that [Jayda] could be trusted to protect the relationship between the child and [Cleveland]. I think that's what it comes down to."

The court ultimately concluded that "primary custody with [Cleveland] is a much safer bet for the continued preservation of the child's relationship with [Jayda] than primary custody with [Jayda] would be for the continued preservation of the child's relationship with [Cleveland]." The court noted that Jayda "had a significant number of opportunities to prove that she could protect that relationship and promote it, and she's not been able to do that." Noting that the daughter had "been almost exclusively with one parent for the first" 90% of her life but that she was "entitled to have a relationship with her mom and with her dad," the court awarded primary physical custody to Cleveland with visitation to Jayda. The court awarded joint legal custody, with tie-breaking authority to Cleveland if the parents could not agree on a legal custody issue.

### 6. Written order

The superior court later issued written findings of fact and conclusions of law addressing the statutory factors and the daughter's best interests.[27]

Regarding factors (1) and (2), the court said there was "no evidence that the child has any special needs" and found that the parents equally had the "desire and

---

[27] AS 25.24.150(c) provides:

In determining the best interests of the child the court shall consider

(1) the physical, emotional, mental, religious, and social needs of the child;

(2) the capability and desire of each parent to meet these needs;

(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;

(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child . . . ;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child . . . ; and

(9) other factors that the court views pertinent.

capability of meeting the child's needs." Regarding factor (3), the court found that the daughter was then only six years of age and her preference "[wa]s not a relevant factor." Regarding factor (4), the court found that "love and affection exists between the child and each of her parents in quantities that cannot be meaningfully distinguished." Regarding factor (7), the court found insufficient evidence to establish that Jayda had committed a crime of domestic violence. Regarding factor (8), the court found that no evidence was presented by either party about substance abuse, child abuse, or neglect in either household.

The court reasoned that the determinative custody factors were factor (5), "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity," and factor (6), "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." Noting Schweigert's lack of confidence that Jayda could protect the daughter's relationship with Cleveland, the court detailed the evidence presented at trial and cited the custody investigator's testimony that she could "not think of anything else this court could do, or put into place, to protect the father's relationship if the mother had primary physical custody of the child."

The court believed Jayda would continue to undermine Cleveland's relationship with the daughter, eventually forcing the parties to litigate "all over from scratch" in a new state court. The court noted that Jayda had engaged in these behaviors even with the court supervising the litigation, indicating that: (1) Jayda "completely lacks awareness of how her behaviors undermine [the daughter's] relationship with [Cleveland]" and (2) "there is no reason to expect [Jayda's] behavior to improve when the court is no longer actively monitoring it." The court concluded that the daughter "is entitled to a strong and healthy relationship with both" parents and that it could not "in

good conscience ignore the significant evidence of [Jayda's] interference in the relationship . . . , the loss of which would imperil the daughter's future happiness."

### 7.    Appeal

Jayda appeals, contending that the court gave disproportionate weight to the custody investigator's trial testimony and to maintaining the father-daughter relationship under the statutory custody factors.

### B.    Standard Of Review

"The trial court has broad discretion in child custody decisions. A trial court's determination of custody will be set aside only if the entire record demonstrates that the controlling findings of fact are clearly erroneous or that the trial court abused its discretion."[28] "Abuse of discretion is established if the trial court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[29]

### C.    Discussion

Jayda contends that the superior court erred by giving too much weight to Schweigert's testimony and that Schweigert's testimony was inconsistent with her earlier report. Jayda also contends that the court misapplied the best interests factors by failing to give proper weight to the length of time the daughter lived in "a stable, satisfactory environment[,] and the desirability of maintaining continuity" and by failing to consider

---

[28]    *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002) (footnote omitted).

[29]    *Id.* (citing *Gratrix v. Gratrix*, 652 P.2d 76, 80 (Alaska 1982)).

the impact of removing Jayda, whom the daughter had lived with since birth, from the daughter's life.[30]

Cleveland counters that the superior court appropriately focused on the determinative factors in this case. He contends that the record supports the court's decision that placing the daughter with him was necessary to maintain the father-daughter relationship.

### 1. Consistency and weight of Schweigert's recommendation

Schweigert recommended in her December 2017 report that Jayda be awarded primary physical custody. Schweigert at that time did "not believe a change in placement would serve [the daughter's] best interests" because Jayda was the "primary attachment figure; [Jayda] ha[d] shown significant improvement in her behavior and conduct as a result of this litigation process"; Cleveland had contributed to the conflict; and there was no indication Jayda "would intentionally violate a court order." But

---

[30] In *Moeller-Prokosch v. Prokosch* (*Moeller I*) we set forth a two-step test that the superior court must apply in its best interests analysis if a parent's plans to move are tied into the custody determination. 27 P.3d 314, 316-17 (Alaska 2001) (holding that court must first determine if the move is "legitimate" and then apply statutory custody factors to determine custody arrangement that serves child's best interests). And in *Moeller III*, we clarified that the court further must provide "symmetric consideration" to the child's best interests by examining the consequences to the child of awarding custody to both the moving parent and non-moving parent. *Moeller-Prokosch v. Prokosch (Moeller III)*, 99 P.3d 531, 535-36 (Alaska 2004). Jayda contends the court failed to follow the *Moeller-Prokosch* framework and apply symmetric considerations in analyzing the impact of the daughter's move to Washington, D.C. "But [the framework] does not apply when the parents *already* live in separate locations at the time of the evidentiary hearing and the court hears evidence about the child's environment in both locations." *Pingree v. Cossette*, 424 P.3d 371, 385 (Alaska 2018) (emphasis in original). Jayda and Cleveland already had moved outside Alaska before the custody trial, and there is no indication they intended to again relocate. Thus, the *Moeller-Prokosch* framework does not apply in this case.

Schweigert expressed concerns about Jayda's attempts to alienate the daughter from Cleveland, recommended the court find that Jayda and Richard had "interfered with the parental relationship between [the daughter] and" Cleveland, and cautioned that if Jayda and Richard continued to interfere, "a change in primary placement may be the only way to preserve and protect" Cleveland's relationship with the daughter.

Schweigert's August 2018 supplemental report raised further concerns about Jayda's alienation of the daughter from Cleveland. Schweigert discussed additional incidents of Jayda interfering in Cleveland's visits. Schweigert also considered her conversation with the daughter's counselor, who explained that Jayda's sending the daughter text "messages that her mother missed her and sending the child photographs during [Cleveland's] visit was very inappropriate." Schweigert nonetheless did not change her recommendation.

Schweigert's placement recommendation changed at trial. Schweigert testified that since December 2017 Jayda had engaged in a "systematic effort to minimize and marginalize [Cleveland's] role," citing Jayda's conduct during Cleveland's summer visitation and the daughter's use of Jayda's maiden name. Schweigert expected that Jayda's interference in the father-daughter relationship likely would only worsen after the litigation ended, testifying: "If [the daughter's] relationship with her father is going to be preserved and protected, I don't see another alternative except for [her] being placed with [Cleveland]."

Despite Jayda's assertion on appeal that Schweigert was inconsistent in her reports and her testimony, the substance of Schweigert's reports is entirely consistent with her later trial testimony. She testified at length on direct and cross-examination on the reasons for her new recommendation. Schweigert recognized that the concerns she raised in her report had become a reality, requiring her to change her custody recommendation.

We previously have recognized that custody investigators "are simply expert witnesses and that their recommendations should be evaluated on a case-by-case basis, in the same manner as testimony presented by other witnesses."[31]  The superior court weighed Schweigert's new custody recommendation against her previous written recommendation and was "confident that she wouldn't be making that recommendation without feeling that there's very strong reason to be concerned."  The record supports that the court appropriately weighed Schweigert's testimony against her written report and the other evidence in the record.  The court did not abuse its discretion in weighing the custody investigator's trial testimony.

### 2. Consideration of all statutory factors and focus on the determinative factors

"The superior court has broad discretion in determining custody awards so long as the determination is in the child's best interests."[32]  The court must consider the factors listed in AS 25.24.150(c) when making its best interests analysis.[33]  And we have emphasized the importance of factor (6), "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child," when "a great distance separates the child[] from the non-custodial parent."[34]

The superior court made written findings about each statutory custody factor.  The court found that most factors either weighed equally or did not apply.  The court did not need to discuss all factors in great detail because the only significant

---

[31]    *Ebertz v. Ebertz*, 113 P.3d 643, 647 (Alaska 2005).

[32]    *Nancy M. v. John M.*, 308 P.3d 1130, 1133 (Alaska 2013) (quoting *Stephanie F. v. George C.*, 270 P.3d 737, 745 (Alaska 2012)).

[33]    *See supra* note 27.

[34]    *Silvan v. Alcina*, 105 P.3d 117, 121 (Alaska 2005).

disputes involved factors (5), (6), and (7).[35] And the court concluded that factor (7), involving domestic violence, did not affect its custody determination because it had insufficient evidence to find that Jayda had committed domestic violence.

Jayda contends that the superior court "appeared to ignore" factor (5), "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity." But the court's decision turned on weighing the daughter's stability with Jayda against Jayda's interference with the father-daughter relationship: "[T]he key factors in this case turn on the . . . stability of the current household, the desirability of maintaining continuity, and the extent to which . . . each party would promote the child's relationship with the other party."

Relevant to factor (5), the court noted that the daughter had "been almost exclusively with one parent for the first . . . 90-percent-plus of [her] life" and that she had "an established relationship and close relationships" with her mother and maternal grandmother, "who are principal figures in her life and have been for a long time." The court reiterated that it "appreciate[d]" that "deep relationship." The court thus clearly considered the impact awarding custody to Cleveland would have on the daughter's relationships with her mother and maternal grandmother.

The court recognized that Cleveland was "slow in stepping up to the plate" in his role as a father, but it felt that the evidence showed the daughter had "successfully attached to him." The court noted that Jayda "had a significant number of opportunities

---

[35]     *Smith v. Weekley*, 73 P.3d 1219, 1227 (Alaska 2003) ("While the court need not make findings on every possible issue, it should at least make findings on those which were relevant and which ultimately influenced its decision."); *see also Borchgrevnik v. Borchgrevnik*, 941 P.2d 132, 139 (Alaska 1997) ("A trial court's factual findings need not be extensive, but must either give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what considerations were involved.").

to prove that she could protect that relationship and promote it, and she's not been able to do that." The court found a "significant amount of evidence" about Jayda's interference in the relationship that "would really imperil [the daughter's] future happiness." It was within the court's authority to determine that Jayda's consistent attempts to isolate the daughter from Cleveland weighed in favor of granting him custody.

The superior court considered all the statutory factors and weighed the most relevant factors. We see no abuse of discretion.

## IV. CONCLUSION

We AFFIRM the superior court's child custody order.