*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ROSEMARIE P., | ) | |
| | ) | Supreme Court No. S-17960 |
| Appellant, | ) | |
| | ) | Superior Court No. 3VA-19-00050 CI |
| v. | ) | |
| | ) | O P I N I O N |
| KELLY B., | ) | |
| | ) | No. 7559 – October 8, 2021 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Valdez, Rachel Ahrens, Judge.

Appearances: Roberta C. Erwin, Palmier~Erwin, LLC, Anchorage, for Appellant. Susan Orlansky, Reeves Amodio LLC, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen and Borghesan, Justices. [Carney, Justice, not participating.]

WINFREE, Chief Justice.

## I.   INTRODUCTION

Two women lived together as unmarried domestic partners. One woman had a child using artificial insemination; the other helped raise the child but did not adopt the child. When the women separated, the biological mother prohibited contact between the child and the other woman, who then petitioned for custody. The superior court

awarded shared custody, and the biological mother appeals. We affirm the shared custody award.

## II.    FACTS AND PROCEEDINGS

### A.    Background Facts

Rosemarie P.[1] and Kelly B. lived in a domestic partnership for about 14 years.[2] When same-sex marriage was not legal in Alaska, they held a "commitment ceremony"; they did not marry when it became legal. Rosemarie and Kelly decided to have a child together using artificial insemination. They chose Rosemarie to give birth and a sperm donor who resembled Kelly. Kelly attended birthing classes and prenatal appointments with Rosemarie. Kelly was present when Rosemarie gave birth in October 2013. Rosemarie's will named Kelly as the child's guardian. They discussed Kelly adopting the child, but an attorney apparently gave them advice making adoption seem problematic; they therefore chose not to have Kelly adopt the child.[3]

Rosemarie and Kelly's relationship ended in 2018, when the child was five years old. Rosemarie initially allowed Kelly to visit the child but later cut off all contact. Kelly filed a superior court complaint to dissolve the domestic partnership and establish joint custody.

### B.    Proceedings

Kelly sought interim shared custody. After a hearing the superior court awarded Kelly interim visitation only. Kelly then granted Rosemarie access to Kelly's

---

[1]    We use the parties' last initials to protect the child's privacy.

[2]    *See Tomal v. Anderson*, 426 P.3d 915, 922 n.4 (Alaska 2018) (describing domestic partnership as involving "unmarried cohabitants living in a marriage-like relationship").

[3]    Whether this legal advice was accurate is irrelevant to our decision.

medical records and agreed to undergo a psychological evaluation. Before making a final custody determination, the court held another hearing, focusing on Kelly's mental health and involvement in the child's life.

Kelly testified about her involvement in the child's daily life. She described routinely feeding, bathing, and playing with the child. She described cooking and cleaning in a home shared with Rosemarie and the child. Kelly said that the child initially called both her and Rosemarie "mommy" and that they taught the child to call Rosemarie "mommy" and Kelly "mommo"; community members also testified to hearing the child call Kelly "mommo."

Kelly's witnesses testified about her role in the child's life, mostly corroborating her testimony. For example, the child's preschool teacher testified: "[T]his was most definitely a family unit. . . . [I]t has never been a question in my mind that [the child] had two moms." A family friend testified: "Their relationship that I've seen personally is very strong. . . . [The child] gets so excited when he sees [Kelly]. And he lets everybody else know that it's his mommo too." Another friend testified: "[T]here's love there. . . . It's definitely not just a person [who] babysits him. It's definitely somebody he cares deeply about."

Rosemarie contradicted some of the testimony about Kelly's involvement in the child's life. Rosemarie testified that she was the child's primary caregiver and that Kelly was more like a stepparent than a mother. Rosemarie also testified that Kelly was impatient, angry, and occasionally violent toward the child. Rosemarie testified that Kelly once "violently" shook the child while in his car seat, which "scared [Rosemarie] to death."

Rosemarie agreed that some of Kelly's testimony was accurate. Rosemarie conceded that she had called Kelly her "wife"; that they decided to have the child together; that Kelly was present at the birth; that the child called Kelly "mommo"; and

that they taught the child he had "two moms." Rosemarie also conceded that Kelly "was a part of [the child's] life for five years" and "[t]here daily." And Rosemarie conceded that they raised the child "as a team" and that she had called them a "family."

Rosemarie's witnesses testified about Kelly's interactions with the child. A friend testified that Kelly was "more punishing," putting the child "in the closet, tak[ing] things away from him, [and] threaten[ing] him." He also testified that in one incident Kelly "snapped at [the child] a few times and finally she grabbed him by the arm and yanked on it extremely hard." A neighbor testified about a time when Rosemarie brought the child to the neighbor's house because Rosemarie "was worried about her[] and [the child's] safety." But the neighbor conceded that he had not seen Kelly "us[e] physical discipline on [the child]." Rosemarie's mother testified that at least "two or three times that really stand out" Kelly harmed or inappropriately disciplined the child.

The hearing also focused on Kelly's mental health. An expert submitted a report about Kelly's mental health after interviewing Kelly and Rosemarie, administering diagnostic tests, and considering collateral information. The report noted that Kelly may have been diagnosed with Bipolar Disorder in the mid-1990s after a traumatic breakup.[4] The expert concluded that "there is no documentation of" the Bipolar Disorder diagnosis but that if Kelly "did have a hypomanic episode . . . then she would fit the criterion for" Bipolar Disorder.[5] The expert declined to diagnose Kelly

---

[4] Bipolar Disorder is "an affective [disorder] characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depres[s]ive episodes." *Bipolar Disorder*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[5] A manic episode is "a manifestation of major mood disorder involving enduring periods of persistent and significant elevated, expansive, or irritable mood, and associated symptoms including decreased sleep, psychomotor speeding, racing thoughts, flight of ideas, grandiosity, and poor judgment leading to behavior that may later be
(continued...)

with Bipolar Disorder, instead diagnosing her with Major Depressive Disorder of mild severity.[6]  An interpersonal relations test "provided no evidence of dysfunction" but indicated that Kelly "experienc[es] malaise and related symptoms of low grade depression."  Kelly's "[i]nterpersonal style" was "characterized as warm, friendly, and sympathetic. . . . She is equally likely to be caring [as] controlling."  The expert noted that Kelly "appears to be taking ownership for her contribution to the issues in the relationship."  The expert concluded that Kelly likely could co-parent with Rosemarie but recommended continued counseling.  He also concluded that Kelly "need[ed] to be stable emotionally and in compliance with her medication prescription to reduce the possibility of future stressful interactions with [the child]" and that she could capably follow a court order to that effect.

The parties also testified about Kelly's mental health.  Kelly testified that her mental health was stabilized and controlled through medication.  She testified that she voluntarily had seen various doctors and taken various prescribed medications.  She endorsed the expert's report, agreed to attend further counseling, and agreed to follow any medication-related court order.

Rosemarie testified to her experience with Kelly's severe, sometimes uncontrolled, manic and depressive episodes.  Rosemarie also testified that Kelly

---

[5]     (...continued)
regretted."  *Manic Episode*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).  A hypomanic episode involves the same features but to a lesser degree.  *Hypomanic Episode*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[6]     Major Depressive Disorder is "a mental disorder characterized by sustained [depression] of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness."  *Major Depression*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).  This was consistent with the diagnoses of two other medical professionals.

repeatedly became irritable and erratic after going off her medication without medical supervision and that Kelly's attempts to go off her medication damaged their relationship.

After the hearing the superior court requested written closing arguments, specifically asking the parties to address "equal protection or things like that from other states." Kelly's written closing argument addressed *Obergefell v. Hodges*,[7] discussed the constitutional rights of same-sex couples, and surveyed non-Alaska cases addressing similar custody issues. Rosemarie primarily analogized to psychological parent law from Oregon and argued that Kelly had not proved that sole custody with Rosemarie would harm the child's welfare.

In a written order the superior court interpreted Alaska's legitimation statute and found that Kelly is the child's legal parent under the statute.[8] The court alternatively found that Kelly is the child's psychological parent and that denying Kelly custody would harm the child's welfare.[9]

The superior court found that Kelly is the child's parent based on evidence that: the parties held a commitment ceremony and lived together for about 14 years;

---

[7] 576 U.S. 644, 680 (2015) (concluding U.S. Constitution "does not permit the [government] to bar same-sex couples from marriage").

[8] AS 25.20.050 ("A child . . . is legitimated and considered the heir of a putative parent when . . . the putative parent is determined by a superior court . . . upon sufficient evidence, to be a parent of the child. Acceptable evidence includes . . . conduct and bearing toward the child . . . indicat[ing] that the child is the child of the putative parent.").

[9] *See Carter v. Brodrick*, 644 P.2d 850, 855 (Alaska 1982) ("[Alaska's] statutes recognize that those relationships that affect the child which are based upon psychological rather than biological parentage may be important enough to protect through custody and visitation.").

Rosemarie had listed Kelly as the child's guardian on official documents; they raised the child "as a team"; they told the child he "had two moms"; and they "discussed all significant elements of the child's upbringing together." The court emphasized that the child calls Kelly "[m]ommo," suggesting that "he views her as a psychological parent." The court also noted that Kelly and the child have a "mutually loving relationship." It highlighted that the primary testimony contradicting the quality of the child's relationship with Kelly came from Rosemarie and that this testimony was "impossible to believe" in light of the parties' "intimate relationship over the first five years of [the child's] life." The court excused Kelly's decision not to adopt the child because it was based on potentially problematic legal advice.

The superior court also explicitly found "by clear and convincing evidence that [the child's] welfare requires [Kelly] to have joint legal and shared physical custody."[10] The court noted that the child has viewed Kelly as a "caregiver" and "mother figure" since birth. The court concluded that the child "would suffer clear detriment if he were placed solely in Rosemarie's custody."[11] The superior court then analyzed the statutory best interests factors and made detailed, well-supported factual findings related to each factor.[12] The court concluded that shared custody was in the child's best interests and awarded joint legal and 50/50 shared physical custody.

Rosemarie appeals.

---

[10] *See Dara v. Gish*, 404 P.3d 154, 161 (Alaska 2017) (requiring, before awarding third-party custody, finding by clear and convincing evidence that child's welfare requires third-party custody or that parent is unfit).

[11] *See id.* (stating child's welfare requires third-party custody when absence would cause child to suffer clear detriment).

[12] *See* AS 25.24.150(c) (requiring court to consider nine statutory factors to determine custody arrangement in child's best interests).

## III. STANDARD OF REVIEW

Superior courts have broad discretion to award custody.[13] We will reverse a custody award only if the superior court abused its discretion or relied on clearly erroneous factual findings.[14] A factual finding is "clearly erroneous when a review of the record leaves us with the definite impression that a mistake has been made."[15] Whether a parent-like figure is a psychological parent presents a question of fact.[16]

## IV. DISCUSSION

The superior court awarded custody to Kelly as a legal parent and alternatively as a psychological parent. As discussed below, we affirm the court's psychological parent analysis without addressing the merits of the court's legitimation statute analysis.

### A. We Affirm The Superior Court's Psychological Parent Analysis And Resulting Custody Award.

The superior court awarded shared custody based on findings that Kelly is the child's psychological parent and that sole custody with Rosemarie therefore would be clearly detrimental to the child. A psychological parent is:

> [O]ne who, on a day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological need for an adult. This adult becomes an essential focus of the child's life, [being] not only the source

---

[13] *Dara*, 404 P.3d at 159.

[14] *Id.*

[15] *Id.* (quoting *Osterkamp v. Stiles*, 235 P.3d 178, 183 (Alaska 2010)).

[16] *See id.*

of the fulfillment of the child's physical needs, but also the source of . . . emotional and psychological needs.[17]

Alaska courts consider various factors to determine whether a third party is a psychological parent, including the length of the relationship with the child,[18] the age and opinion of the child,[19] and whether there is a "strong and heartfelt bond" between the adult and child.[20]

In light of a parent's constitutional right to custody,[21] a third party seeking custody — such as a psychological parent — must prove "by clear and convincing evidence" *either* "that the parent is unfit *or* that the welfare of the child requires the child to be in the custody of the [third party]."[22] This case involves only the "welfare of the

---

[17]     *Carter v. Brodrick*, 644 P.2d 850, 853 n.2 (Alaska 1982) (quoting Max F. Gruenberg, Jr. & Robert D. Mackey, *A New Direction for Child Custody in Alaska*, 6 UCLA ALASKA L. REV. 34, 36 (1976)).

[18]     *See Dara*, 404 P.3d at 165 (concluding superior court did not clearly err by relying on parties being primary caregivers for more than half of child's life when deciding psychological parent status); *Osterkamp*, 235 P.3d at 189 (concluding superior court did not clearly err by finding few months insufficient to establish psychological parent status).

[19]     *See Osterkamp*, 235 P.3d at 189 (considering child's age and inability to vocalize whether person played parental role).

[20]     *See Dara*, 404 P.3d at 164 (noting psychological parents' bond with child and status as primary caregivers for majority of child's life).

[21]     *Alex H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 389 P.3d 35, 48 (Alaska 2017) ("The 'right to the care and custody of one's own child is a fundamental right recognized by both the federal and state constitutions.' " (quoting *Seth D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1222, 1227 (Alaska 2008))).

[22]     *Dara*, 404 P.3d at 161 (emphasis added) (quoting *Osterkamp*, 235 P.3d at (continued...)

child" prong. To prove that the child's welfare requires third-party custody, the third party "must show that the child would suffer clear detriment if placed in the [sole] custody of the parent."[23] Thus, "although '[p]sychological parent status does not *entitle* a third party to custody[,] . . . this status can help a third party prove that it would be clearly detrimental to a child to deny third[-]party custody.' "[24]

Rosemarie unpersuasively contends that the court's clear detriment finding is clearly erroneous. She first contends that Kelly did not present the right type of evidence, noting that "[n]o experts testified on behalf of [Kelly]" and that "no doctor records, no school reports, or any documents" support Kelly's claims. But Rosemarie cites no Alaska law on this issue, instead analogizing to an Oregon case.[25] We conclude that Alaska law does not necessarily require expert testimony on psychological parent issues.[26]

Rosemarie next contends that significant evidence conflicts with the superior court's clear detriment finding. Under the psychological parent analysis, Kelly had an "extremely high burden" to prove by clear and convincing evidence that sole

---

[22]    (...continued)
185).

[23]    *Id.* (quoting *Osterkamp*, 235 P.3d at 185).

[24]    *Id.* at 161 (emphasis and first two alterations in original) (quoting *Osterkamp*, 235 P.3d at 184 n.17).

[25]    *Husk v. Adelman*, 383 P.3d 961 (Or. App. 2016) (noting trial court had considered expert testimony among other factors relevant to custody, but determining that two other factors weighed most heavily).

[26]    *Cf. Dara*, 404 P.3d at 164-65 (discussing, but not expressly requiring, expert testimony relevant to psychological parent finding); *Kinnard v. Kinnard*, 43 P.3d 150, 154 (Alaska 2002) (discussing, but not expressly requiring, expert testimony relevant to psychological parent finding).

custody with Rosemarie would be clearly detrimental to the child.[27] But we "ordinarily will not overturn a trial court's finding based on conflicting evidence" or "re-weigh evidence when the record provides clear support for the trial court's ruling."[28]

The record provides clear support for the findings that Kelly was the child's psychological parent and that separating them would be detrimental to the child. For example, Kelly testified about routinely feeding, bathing, and playing with the child over the first five years of his life. Kelly testified that the child initially called both her and Rosemarie "mommy" and that they taught him to call Rosemarie "mommy" and Kelly "mommo"; witnesses testified that the child calls Kelly "mommo" and that they lived as a "family unit." Witnesses also testified that the child suffered and missed Kelly after their separation. Rosemarie argues that these witnesses did not know Kelly long enough to understand her bond with the child, but the superior court specifically rejected this credibility argument; the court concluded that Kelly's witnesses shared relevant information and that Rosemarie "produced no [competing] witness to contradict their testimony other than her own" testimony.

Rosemarie conceded that the child calls Kelly "mommo" and that they taught the child he has "two moms." Rosemarie also conceded that Kelly "was a part of [the child's] life for five years" and "[t]here daily"; that they raised the child "as a team"; and that she had called them a "family." This evidence supports the findings that

---

[27]     *Dara*, 404 P.3d at 162.

[28]     *Id.* at 159 (quoting *In re Adoption of S.K.L.H.*, 204 P.3d 320, 325 (Alaska 2009)).

(1) Kelly has been present in the child's life daily since birth and (2) the child considers Kelly a parent.[29]

Rosemarie points to her own testimony alleging that Kelly was not a major part of the child's life. But the superior court explicitly found Rosemarie's testimony that Kelly did not have a close bond with the child "impossible to believe." And a court's "factual findings enjoy particular deference when they are based 'primarily on oral testimony.' "[30] Nothing in the record establishes that the court was required to believe Rosemarie or that the court made a mistake on this issue. The court's factual findings therefore are not clearly erroneous.

Rosemarie next argues that Kelly had abused the child, preventing formation of the necessary psychological bond. But the superior court found that Kelly had not committed domestic violence or engaged in a pattern of verbal abuse. And a mental health expert noted that Kelly's results on a test measuring child abuse potential raised no concerns. The expert also concluded that Kelly could co-parent with Rosemarie. Although the expert had some concerns about Kelly when she is not medicated, he explicitly found that Kelly has the capacity to follow court orders. The

---

[29] It is not the case, as Rosemarie suggests, that a psychological parent must form "the child's strongest psychological bond[]" (emphasis omitted) to show clear detriment to the child from severing that bond. We have stated that when a child's strongest psychological bond is with a third party, severing that bond is detrimental to the child. *Osterkamp*, 235 P.3d at 186 ("[W]hen a child's 'strongest psychological bonding' is with third parties, 'it would be detrimental to [the child] to destroy those bonds.' " (second alteration in original) (quoting *Todd v. Todd*, 989 P.2d 141, 143 (Alaska 1999) *overruled in part on other grounds by Evans v. McTaggart*, 88 P.3d 1078, 1083-84 (Alaska 2004))). But we have not said that severing a child's strongest bond is the only way to prove a clear detriment.

[30] *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011)).

court expressly credited Kelly's testimony that she will follow court orders to take medication as prescribed. This evidence supports the court's finding that allegations about Kelly inappropriately disciplining the child were not credible.

Rosemarie's competing evidence does not establish that Kelly has physically or verbally abused the child or that she will in the future. Rosemarie selectively quotes the expert report, and she points to Kelly's testimony that she once was diagnosed with Bipolar Disorder. But the record contains no evidence about Kelly's actual diagnosis. Rosemarie also points to her own, her mother's, and two family friends' testimony alleging Kelly's "abusive" behavior. The superior court sensibly could have relied on the expert-administered test to conclude that, despite some contrary testimony, Kelly was unlikely to harm the child.

Rosemarie essentially asks us to reweigh the evidence, but we ordinarily will not reweigh evidence, especially oral testimony.[31] Because substantial oral and written testimony from several witnesses and an expert supports the superior court's clear detriment finding, it is not clearly erroneous.

**B.      The Custody Award Does Not Violate Rosemarie's Constitutional Rights.**

Rosemarie correctly notes that the federal and Alaska constitutions protect a parent's right to custody and care of one's own child,[32] but her arguments that awarding Kelly custody violated this constitutional right are unpersuasive.

---

[31]     *Dara*, 404 P.3d at 162; *Limeres*, 320 P.3d at 296.

[32]     *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *Alex H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 389 P.3d 35, 48 (Alaska 2017).

As discussed above Kelly is the child's psychological parent, and Alaska's usual third-party custody framework thus applies.[33] We have "regularly applied this legal framework in third-party custody cases without challenge to its constitutionality"[34] and have explained that it adequately "protects parents' constitutional rights."[35] Rosemarie concedes that "Alaska [courts have] repeatedly upheld this standard." And, as in similar cases, Rosemarie "presents no argument why we should consider a departure now."[36] She merely asserts in general terms that her rights were violated. Thus, "[i]f the superior court applied the correct third-party custody legal standard . . . there is no reason to question the constitutionality of its decision."[37]

Rosemarie also contends that the superior court incorrectly applied Alaska's third-party custody framework, arguing that the court was required to find that she was an unfit parent before awarding custody to a third party. But Rosemarie misconstrues the framework. A court may award custody to a third party after finding by clear and convincing evidence *either* (1) "that the parent is unfit" *or* (2) "that the welfare of the child requires the child to be in the custody of the [third party]."[38] The superior court in this case found "by clear and convincing evidence" that "[the child] would suffer clear detriment if he were placed solely in Rosemarie's custody." And, as discussed above,

---

[33]     *See Dara*, 404 P.3d at 161-62.

[34]     *Id.* at 161.

[35]     *Id.* at 160.

[36]     *Id.* at 161; *see, e.g.*, *Osterkamp v. Stiles*, 235 P.3d 178, 184-89 (Alaska 2010); *Elton H. v. Naomi R.*, 119 P.3d 969, 975-77 (Alaska 2005); *Kinnard v. Kinnard*, 43 P.3d 150, 153-55 (Alaska 2002).

[37]     *Dara*, 404 P.3d at 161.

[38]     *Id.* (quoting *Osterkamp*, 235 P.3d at 185).

that finding was not clearly erroneous. Because the court applied the correct third-party custody framework, the custody award does not violate Rosemarie's constitutional rights.[39]

### C. We Do Not Address Constitutional Issues Implicated By Alaska's Legitimation Statute.

The superior court alternatively interpreted Alaska's legitimation statute as applying to Kelly.[40] The statute establishes various ways in which a putative parent may become a child's legal parent.[41] The statute uses language that is sex-neutral (such as "putative parent") but also language that historically has described only one sex (such

---

[39] We note in response to a question raised at oral argument that the constitutionally derived biological parental preference does not apply in modification proceedings after a third party has been granted custody. *Abby D. v. Sue Y.*, 378 P.3d 388, 392 (Alaska 2016) ("[W]hen [a] non-parent has already been granted permanent custody, the parental preference drops out in subsequent modification proceedings." (quoting *Evans v. McTaggart*, 88 P.3d 1078, 1085 n.32 (Alaska 2004))).

[40] Alaska Statute 25.20.050(a) provides:

> A child born out of wedlock is legitimated and considered the heir of the putative parent when (1) the putative parent subsequently marries the undisputed parent of the child; (2) for acknowledgments made before July 1, 1997, the putative parent acknowledges, in writing, being a parent of the child; (3) for acknowledgments made on or after July 1, 1997, the putative father and the mother both sign a form for acknowledging paternity under AS 18.50.165; or (4) the putative parent is determined by a superior court without jury or by another tribunal, upon sufficient evidence, to be a parent of the child. Acceptable evidence includes evidence that the putative parent's conduct and bearing toward the child, either by word or act, indicates that the child is the child of the putative parent.

[41] *See id.*

as "mother" and "father").[42]  According to the superior court, this linguistic tension created ambiguity about superior courts' ability to adjudicate whether women — especially those in same-sex relationships — were non-biological parents.  The superior court ultimately concluded that, despite scattered use of the word "father," interpreting the statute as not applying to women in same-sex couples probably would violate equal protection under the federal and Alaska constitutions.[43]

The parties dispute whether the superior court correctly interpreted Alaska's legitimation statute.  But, because we affirm the superior court's psychological parent finding, we do not need to reach the statutory issue.  The Alaska legislature may wish to address, in the first instance, the constitutional issues potentially raised by Alaska's current legitimation statute.

## V.   CONCLUSION

We AFFIRM the superior court's decision.

---

[42]    *See id.*

[43]    The superior court discussed various federal cases: *Obergefell v. Hodges*, 576 U.S. 644, 670 (2015) (explaining same-sex couples are entitled to "constellation of benefits that the States have linked to marriage"); *Latta v. Otter*, 771 F.3d 456, 473 (9th Cir. 2014) ("[A] desire to express a preference for opposite-sex couples over same-sex couples is a categorically inadequate justification for discrimination."); *SmithKline Beecham Corp. v. Abbott Lab'ys,* 740 F.3d 471, 483 (9th Cir. 2014) ("[W]hen state action discriminates on the basis of sexual orientation, we must examine its actual purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status.").