*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MITCHEL P. WOLFGRAM, | ) | |
| | ) | Supreme Court No. S-18700 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-21-01204 CI |
| v. | ) | |
| | ) | O P I N I O N |
| NADIRAH V. DAVIS-PERKINS, | ) | |
| | ) | No. 7691 – March 22, 2024 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Thomas I. Temple, Judge.

Appearances:  Amy J. Schrum, Golden Heart Law, LLC, Fairbanks, for Appellant.  Nadirah Davis-Perkins, pro se, Fairbanks, Appellee.

Before:  Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.

## I.  INTRODUCTION

A man petitioned for shared custody of a child whom he helped raise with the child's biological mother.  During the custody proceedings genetic testing established that the man was not the child's biological father.  The man argued, however, that it would be detrimental to the child's welfare to deny him custody.

Although the trial court found that the man was the child's psychological parent, it declined to consider his relationship with the child in its decision to award sole custody to the mother. Because the custody award was based on a misapplication of our third-party custody framework, we vacate the award and remand for further proceedings.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Nadirah Davis-Perkins was dating Mitchel Wolfgram when she gave birth to Genevieve[1] in January 2018. Wolfgram attended Genevieve's birth. He signed her birth certificate and Davis-Perkins signed an affidavit of paternity stating that Wolfgram was Genevieve's father. The parties gave Wolfgram's last name to Genevieve, and he is the only father she has ever known.[2] His family has been involved in Genevieve's life since her birth.

The parties dated intermittently from before Genevieve's birth until February or March 2020. The parties had an informal arrangement to share custody equally, alternating every two weeks to accommodate Wolfgram's work schedule on the North Slope. After the parties ended their dating relationship, they maintained their informal custody arrangement, though in practice Wolfgram did not always have two full weeks at a time with Genevieve.

In January 2021, while Wolfgram was working on the North Slope, Davis-Perkins moved with Genevieve to Minnesota without notifying Wolfgram. Wolfgram promptly sought temporary orders to compel Davis-Perkins to return Genevieve to Alaska.

---

[1]    We use a pseudonym to protect the child's privacy.

[2]    Davis-Perkins testified that Genevieve does not know her biological father, and he is not a party in this case.

### B. Proceedings

#### 1. The custody litigation

In addition to his request for temporary orders, Wolfgram filed a petition for joint legal and shared physical custody in February 2021. The trial court ordered Davis-Perkins to return Genevieve to Alaska. Genevieve returned, and Davis-Perkins soon followed. The parties then resumed their shared custody arrangement.

In his petition Wolfgram acknowledged that both he and Davis-Perkins were "fit and proper persons" to share custody of Genevieve. In her answer Davis-Perkins requested sole decision-making authority and primary physical custody with Wolfgram to have visitation on Saturdays and Sundays.

In June 2021 Davis-Perkins moved to compel genetic testing to establish that Wolfgram was not Genevieve's biological father. The court ordered a paternity test. The results established Wolfgram was not Genevieve's biological father.

The superior court held a trial in December 2022. At the outset the court announced that Wolfgram was seeking custody as a "non-parent." As a non-parent, he was required to show by clear and convincing evidence either that Davis-Perkins was unfit or that Genevieve's welfare required awarding custody to Wolfgram. The court explained that "[o]ne element of the welfare of the child requirement is that the non-parent must show that the child would suffer clear detriment if placed in the custody of the parent."

The court heard testimony from Wolfgram, Wolfgram's mother, and Davis-Perkins. Wolfgram testified that he signed Genevieve's birth certificate and that Genevieve calls him "Dad." He said Genevieve "loves [his] side of the family" and has spent time with them during visits to Minnesota. The court admitted into evidence photographs of Genevieve with Wolfgram and his family members, reasoning that the photographs "show[ed] that there's some familiarity and relationship."

Wolfgram's mother testified that she was present for Genevieve's birth and saw Wolfgram sign the birth certificate. She stayed in Alaska for two weeks after

Genevieve was born. During Genevieve's first year, Wolfgram's mother (who lives in Minnesota) provided care for a total of ten weeks, usually on occasions when Wolfgram was working and Genevieve was visiting Minnesota with Davis-Perkins.

Davis-Perkins testified about Wolfgram's role in Genevieve's life. She confirmed that Genevieve referred to Wolfgram as "Dad." At one point Davis-Perkins testified that it would "certainly" be detrimental for Genevieve to lose contact with Wolfgram. But later she testified that although "it wouldn't be the best" to remove Wolfgram from Genevieve's life, she did not think doing so would be detrimental. She agreed that Wolfgram "is a good dad" but said he "does not carry the responsibilities of what being a parent is and what it's about." Davis-Perkins expressed that she wanted to be the person who "makes decisions in . . . and about" Genevieve's life and believed that was "solely [her] right." However, she said that taking Wolfgram out of Genevieve's life completely "would be [doing] a disservice as a mother."

Davis-Perkins explained that she had moved Genevieve to Minnesota because both sides of Genevieve's family are within driving distance, so she and Genevieve would "ha[ve] the support system that they need[ed]." She thought "it would not be detrimental" and would not "damage [Genevieve]" to return with her to Minnesota because "she'll be surrounded by family and plenty of love." However, Davis-Perkins agreed that Wolfgram and Genevieve were "bonded together." She understood Wolfgram "has been a big part of Genevieve's life" and claimed she was "not looking to erase him . . . out of [Genevieve's] life."

### 2. The trial court's findings

At the conclusion of testimony the trial court found there was clear and convincing evidence that Wolfgram was Genevieve's psychological parent.[3] It

---

[3] A psychological parent is an adult who "on a day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological

acknowledged the preference to award custody to the legal parent in custody disputes involving third parties. The court then stated that Wolfgram would need to prove one of three circumstances: (1) that it "clearly would be detrimental to the child's welfare to permit the [legal] parent to have custody," (2) that the legal parent is unfit, or (3) that the legal parent had abandoned the child. There were no allegations of abandonment. The court focused on detriment to Genevieve's welfare because it found there was "no evidence that Ms. Davis-Perkins is unfit." Its analysis turned "not [on] whether it would be detrimental" to deny Wolfgram custody, but on "whether it would be detrimental to [Genevieve's] welfare to permit Ms. Davis-Perkins to have custody."

The court found that there was no evidence that it would be detrimental to Genevieve's welfare for Davis-Perkins to have custody. It characterized Wolfgram's request for shared custody as "a concession and an acknowledgment" that awarding Davis-Perkins custody would not be detrimental. The court found that both parties were "able, capable, and willing" to care for Genevieve, Wolfgram was "properly parenting," and Wolfgram had a "great support network." The court suggested that if Wolfgram were Genevieve's biological father, the court "would probably be ratifying the 50/50 custody agreement because [Wolfgram and Davis-Perkins were] both, in fact, good parents."

The court announced it was awarding Davis-Perkins primary physical custody and sole legal custody. It elaborated that this meant that Wolfgram "has no legal rights to the child" and that the extent of Wolfgram's relationship with Genevieve would be left to Davis-Perkins' discretion. The court asserted that it did not "have any options" under the law but to award Davis-Perkins sole custody "even though the court recognize[d] that Mr. Wolfgram would be a great parent."

---

need for an adult." *Rosemarie P. v. Kelly B.*, 504 P.3d 260, 264 (Alaska 2021) (quoting *Carter v. Brodrick*, 644 P.2d 850, 853 n.2 (Alaska 1982)). A psychological parent also fulfills the child's physical and emotional needs. *Id.*

Wolfgram appeals.

## III.  STANDARD OF REVIEW

"[W]hether the court applied the correct standard in a custody determination is a question of law we review de novo."[4]

## IV.  DISCUSSION

Wolfgram argues the trial court misapplied Alaska's third-party custody framework by failing to consider his relationship with Genevieve when determining whether it would be clearly detrimental to her to deny him custody. Wolfgram asserts that, as a consequence, the court also erred by holding that he failed to meet his burden of proof to demonstrate that he should be awarded shared custody or visitation. Davis-Perkins does not dispute the court's finding that Wolfgram is Genevieve's psychological parent. Instead she asks us to adopt the court's conclusion that Wolfgram failed to meet his burden as a third party seeking custody.

We agree with Wolfgram that the court erred in applying our third-party custody framework. We vacate the custody award and remand for a determination of whether Wolfgram proved by clear and convincing evidence that it would be detrimental to Genevieve to deny Wolfgram any level of custody or visitation. As part of this determination, the court must consider evidence of Genevieve's relationship with Wolfgram in addition to evidence of her relationship with Davis-Perkins.

### A.  Our Third-Party Custody Framework Requires Courts To Consider A Psychological Parent's Relationship With The Child When Analyzing The "Welfare Of The Child" Prong.

Under our custody framework, a legal parent — that is, a biological or adoptive parent — receives preference over third parties, including a psychological

---

[4]    *Osterkamp v. Stiles*, 235 P.3d 178, 184 (Alaska 2010) (quoting *Elton H. v. Naomi R.*, 119 P.3d 969, 973 (Alaska 2005)).

parent.[5]  The court must award sole custody to the legal parent "unless the trial court determines that the parent is unfit, has abandoned the child, or that the welfare of the child requires that a non-parent receive custody."[6]  Thus, assuming abandonment is not at issue, a third party has two options for obtaining custody or visitation:  "[P]rove 'by clear and convincing evidence' *either* 'that the [legal] parent is unfit *or* that the welfare of the child requires the child to be in the custody of the [third party].' "[7]  These two prongs are distinct and require different proof.

Proof of unfitness requires clear and convincing evidence that the legal parent is unable to provide adequate care and make decisions for the child.[8]  By comparison, the "welfare of the child" prong requires proof that it would be clearly detrimental to the child's welfare to award the legal parent sole custody.[9]  Severing the child's relationship with the third party may be detrimental to the child even if it is undisputed that the legal parent is fit.[10]  The "welfare of the child" prong thus involves analyzing "whether awarding custody to the legal parent — and denying custody to the third party — would result in clear detriment to the child."[11]

---

[5]     *Abby D. v. Sue Y.*, 378 P.3d 388, 392 (Alaska 2016); *Evans v. McTaggart*, 88 P.3d 1078, 1082-83, 1085 (Alaska 2004) (stating psychological parents must overcome legal parent preference); *see e.g. Osterkamp*, 235 P.3d at 185-86, 190 (applying parental preference to adoptive mother).

[6]     *Kinnard v. Kinnard*, 43 P.3d 150, 154 (Alaska 2002).

[7]     *Rosemarie P.*, 504 P.3d at 264-65 (emphasis and third alteration in original) (quoting *Dara v. Gish*, 404 P.3d 154, 161 (Alaska 2017)).

[8]     *See Elton H.*, 119 P.3d at 976-77; *Evans*, 88 P.3d at 1085, 1090; *see also Troxel v. Granville*, 530 U.S. 57, 68 (2000) (plurality opinion) (describing fit parent as one who "adequately cares for his or her children").

[9]     *Rosemarie P.*, 504 P.3d at 265.

[10]     *See Osterkamp*, 235 P.3d at 185, 190 (considering "close and loving" relationship between child and third party as one factor in analyzing "welfare of the child" prong where third party conceded legal parent was fit).

[11]     *Id.* at 185.

A psychological parent may assert a claim for custody against a legal parent under the third-party custody framework.[12] Psychological parents have standing to seek custody or visitation because "relationships that affect the child which are based upon psychological rather than biological parentage may be important enough to protect through custody and visitation, to ensure that the child's best interests are being served."[13]

We have recognized that a child's relationship with a psychological parent is relevant in making a custody determination.[14] Accordingly, we have held that "although '[p]sychological parent status does not *entitle* a third party to custody[,] . . . this status can help a third party prove that it would be clearly detrimental to a child to deny third[-]party custody.' "[15] Given that the "welfare of the child" prong focuses on the child and a psychological parent plays an important role in promoting the child's welfare,[16] it follows that a court must consider evidence of the

---

[12] *See Rosemarie P.*, 504 P.3d at 264-65.

[13] *Carter v. Brodrick*, 644 P.2d 850, 855 (Alaska 1982).

[14] *Dara v. Gish*, 404 P.3d 154, 161 (Alaska 2017) ("In determining clear detriment, 'analysis is not limited to examining the child's relationship with the legal parent; courts may take into account the relationship between a child and a third party.' " (quoting *Osterkamp*, 235 P.3d at 185)).

[15] *Rosemarie P.*, 504 P.3d at 265 (alterations and emphasis in original) (quoting *Dara*, 404 P.3d at 161).

[16] *See id.* at 265, 268 (affirming shared custody award because record supported superior court's finding that separating child from psychological parent would be detrimental to child); *Dara*, 404 P.3d at 164-65 (affirming shared custody award where evidence showed biological parent would sever child's "strong and heartfelt bond" with psychological parents and superior court found that awarding biological parent sole custody would be clearly detrimental to child).

psychological-parent relationship to determine whether severing that special relationship would be clearly detrimental to the child.[17]

Thus, we now make explicit what our third-party custody cases have implied: If a court finds that a third party qualifies as a psychological parent, the court must consider evidence of the child's relationship with the psychological parent when evaluating a custody claim under the "welfare of the child" prong. Psychological parents still must overcome the parental preference embedded in our third-party custody framework.[18] And trial courts retain discretion to assign appropriate weight to evidence of the child's relationship with the psychological parent in making custody determinations.[19] But the child's relationship with a psychological parent is a relevant factor the trial court must consider when determining whether awarding sole custody to a legal parent would cause clear detriment to the child.[20]

---

[17] *See Kinnard v. Kinnard*, 43 P.3d 150, 155 (Alaska 2002) (holding trial court "properly examined both the extent of the strong emotional bond" between child and stepmother who was her psychological parent "and the question of whether severing that bond would be detrimental to [the child]").

[18] *See Evans v. McTaggart*, 88 P.3d 1078, 1082-83, 1085 (Alaska 2004) (explaining third-party custody framework that applies to psychological parents and others who are not legal parents); *see also Dara*, 404 P.3d at 160-61 (explaining Alaska's third-party custody framework "appropriately and effectively balance[s]" a legal parent's constitutional right to care and custody of her own child against the child's welfare).

[19] *Michele M. v. Richard R.*, 177 P.3d 830, 834 (Alaska 2008) (stating custody awards are reviewed for abuse of discretion "because it is 'the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence' " (quoting *Knutson v. Knutson*, 973 P.2d 596, 599-600 (Alaska 1999))); *Kinnard*, 43 P.3d at 153 ("It is well settled that trial courts have broad discretion in determining child custody issues.").

[20] *See Osterkamp v. Stiles*, 235 P.3d 178, 185 (Alaska 2010) (stating "welfare of the child" prong involves "determining whether awarding custody to the legal parent — and denying custody to the third party — would result in clear detriment to the child").

**B.**   **It Was Error To Decline To Consider Evidence Of Wolfgram's Psychological-Parent Relationship With Genevieve When Analyzing The "Welfare Of The Child" Prong.**

The trial court misconstrued our third-party custody framework by declining to consider whether severing Wolfgram's psychological-parent relationship with Genevieve would be detrimental to her welfare. The court erroneously interpreted Wolfgram's concession that Davis-Perkins is a fit and capable parent as conclusive evidence that severing Wolfgram's relationship with Genevieve would not be detrimental to her. Examining only whether Davis-Perkins was capable of assuming full custody ignored the possibility that a child may suffer a clear detriment if the child is separated from a psychological parent.[21]

The court also does not appear to have considered how various forms of shared custody and visitation could avoid a detriment to Genevieve. Our decisions applying the third-party custody framework show that trial courts have discretion to award a spectrum of custody or visitation arrangements. In cases between legal parents and third parties, we have affirmed trial court decisions to award sole legal and physical custody for the legal parent and those awarding equally shared custody.[22] We have also affirmed an award of final decision-making authority and primary physical custody for psychological parents with regular visitation for the biological mother.[23] These options are not exhaustive, but they illustrate the breadth of the trial court's discretion.

---

[21]   *See, e.g.*, *Dara*, 404 P.3d at 163-65 (considering biological parent's "unstable" home life, parent's unwillingness and inability to address child's needs, and effect of cutting off contact with psychological parents in upholding superior court's custody award to psychological parents).

[22]   *Osterkamp*, 235 P.3d at 181 (affirming sole custody to legal parent); *Rosemarie P. v. Kelly B.*, 504 P.3d 260, 261, 264, 268 (affirming joint legal and "50/50 shared physical custody"); *see also Kinnard*, 43 P.3d at 152-53, 157 (affirming shared custody).

[23]   *Dara*, 404 P.3d at 157, 159, 165.

The court's misconstruction of the custody framework in this case led to a clearly erroneous finding that "there [was] no evidence . . . that it would be detrimental to [Genevieve] for Ms. Davis-Perkins to have custody of [Genevieve]." Wolfgram's concession that Davis-Perkins is a fit and proper parent does not equate to a failure to present evidence that denying him any amount of custody or visitation would be detrimental to Genevieve. Third parties may present evidence of their relationship with the child to support their petitions for custody even when they concede the legal parent is fit and capable.[24]

Both Wolfgram and Davis-Perkins presented evidence of the importance of Wolfgram's relationship with Genevieve. Indeed, the court presumably relied in part on this evidence when it found Wolfgram is Genevieve's psychological parent. Because severing a child's bond with a psychological parent may be detrimental to the child,[25] evidence that Wolfgram is Genevieve's psychological parent is also probative of whether Genevieve would suffer a clear detriment if Wolfgram is denied any custody and visitation.

---

[24]   *Osterkamp*, 235 P.3d at 185 (explaining "courts may take into account the relationship between a child and a third party" under "welfare of the child" prong where legal parent's fitness was not disputed); *see Rosemarie P.*, 504 P.3d at 265-267 (rejecting contention that psychological parent had to prove biological parent was unfit where record supported superior court's finding that denying psychological parent custody would be detrimental); *Buness v. Gillen*, 781 P.2d 985, 987, 989 (Alaska 1989) (holding superior court abused discretion in granting partial summary judgment based on lack of "specific allegations" of clear detriment because record contained evidence of bond between child and third party), *abrogated in part on other grounds by Evans v. McTaggart*, 88 P.3d 1078, 1085 n.34 (Alaska 2004).

[25]   *See, e.g.*, *Dara*, 404 P.3d at 165 (affirming superior court's custody award based on court's finding that terminating child's relationship with psychological parents would be detrimental).

As explained above, the trial court's psychological-parent finding did not require it to award Wolfgram custody or visitation.[26]  Additionally, the court retained the discretion to assign appropriate weight to evidence of Wolfgram's relationship with Genevieve.[27]

Weighing evidence of a psychological parent's relationship with the child and considering a range of custody options help avoid an arrangement that is detrimental to the child.  Relationships between children and psychological parents "may be important enough to protect through custody and visitation."[28]  Accordingly, trial courts must consider whether awarding sole custody to a legal parent will "cut the [child] off from an emotionally and psychologically important relationship."[29]  Here, Wolfgram presented evidence that he filled an important role in Genevieve's life.  The trial court was required to consider this evidence in determining whether Genevieve would suffer a clear detriment if the court awarded Davis-Perkins sole custody.

## V.  CONCLUSION

We VACATE the superior court's custody award and REMAND for further proceedings consistent with this opinion.

---

[26]  *See id.* at 161.

[27]  *See Michele M. v. Richard R.*, 177 P.3d 830, 834 (Alaska 2008).

[28]  *Carter v. Brodrick*, 644 P.2d 850, 855 (Alaska 1982).

[29]  *Dara*, 404 P.3d at 164.